**IOTA XI CHAPTER OF SIGMA CHI FRATERNITY; John Howlin; John Singsank, Plaintiffs–Appellees,**

v.

**GEORGE MASON UNIVERSITY; Kenneth E. Bumgarner, Defendants–Appellants.**

No. 91–2684.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1992.

Decided May 10, 1993.

Paul Joseph Forch, Sr. Asst. Atty. Gen., Richmond, VA, argued (Mary Sue Terry, Atty. Gen., H. Lane Kneedler, Chief Deputy Atty. Gen., R. Claire Guthrie, Deputy Atty. Gen., Martha M. Parrish, Asst. Atty. Gen., on brief), for defendants-appellants.

Victor Michael Glasberg, Victor M. Glasberg & Associates, Alexandria, VA, argued, Jeanne Goldberg, Victor M. Glasberg & Associates, Alexandria, VA, Michael P. McDonald, Center for Individual Rights, Washington, DC, Stephen B. Pershing, ACLU of Virginia, Richmond, VA, for plaintiffs-appellees.

Before WIDENER and MURNAGHAN, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

SPROUSE, Senior Circuit Judge:

George Mason University appeals from a summary judgment granted by the district court to the IOTA XI Chapter of Sigma Chi Fraternity[1] in its action for declaratory judgment and an injunction seeking to nullify sanctions imposed on it by the University because it conducted an "ugly woman contest" with racist and sexist overtones. We affirm.

I

Sigma Chi has for two years held an annual "Derby Days" event, planned and conducted both as entertainment and as a source of funds for donations to charity. The "ugly woman contest," held on April 4, 1991, was one of the "Derby Days" events. The Fraternity staged the contest in the cafeteria of the student union. As part of the contest, eighteen Fraternity members were assigned to one of six sorority teams cooperating in

---

1. Although Sigma Chi's national fraternity is not involved in the litigation, the IOTA Chapter XI is hereafter referred to as "Sigma Chi" or "the Fraternity."

the events. The involved Fraternity members appeared in the contest dressed as caricatures of different types of women, including one member dressed as an offensive caricature of a black woman. He was painted black and wore stringy, black hair decorated with curlers, and his outfit was stuffed with pillows to exaggerate a woman's breasts and buttocks. He spoke in slang to parody African–Americans.

There is no direct evidence in the record concerning the subjective intent of the Fraternity members who conducted the contest. The Fraternity, which later apologized to the University officials for the presentation, conceded during the litigation that the contest was sophomoric and offensive.

Following the contest, a number of students protested to the University that the skit had been objectionably sexist and racist. Two hundred forty-seven students, many of them members of the foreign or minority student body, executed a petition, which stated: "[W]e are condemning the racist and sexist implications of this event in which male members dressed as women. One man in particular wore a black face, portraying a negative stereotype of black women."

On April 10, 1991, the Dean for Student Services, Kenneth Bumgarner, discussed the situation with representatives of the objecting students. That same day, Dean Bumgarner met with student representatives of Sigma Chi, including the planners of and participants in the "ugly woman contest." He then held a meeting with members of the student government and other student leaders. In this meeting, it was agreed that Sigma Chi's behavior had created a hostile learning environment for women and blacks, incompatible with the University's mission.

The Dean met again with Fraternity representatives on April 18, and the following day advised its officers of the sanctions imposed. They included suspension from all activities for the rest of the 1991 spring semester and a two-year prohibition on all social activities except pre-approved pledging events and pre-approved philanthropic events with an educational purpose directly related to gender discrimination and cultural diversity. The University's sanctions also required Sigma Chi to plan and implement an educational program addressing cultural differences, diversity, and the concerns of women. A few weeks later, the University made minor modifications to the sanctions, allowing Sigma Chi to engage in selected social activities with the University's advance approval.

On June 5, 1991, Sigma Chi brought this action under 42 U.S.C. § 1983[2] against the University and Dean Bumgarner. It requested declaratory judgment and injunctive relief to nullify the sanctions as violative of the First and Fourteenth Amendments. Sigma Chi moved for summary judgment on its First Amendment claims on June 28, 1991, filing with its motions numerous affidavits explaining the nature of the "ugly woman contest." Also submitted were large glossy photographs of the participants as they appeared in the skits, including photographs of the Fraternity member depicting the offensive caricature of the black woman.

In addition to the affidavit of Dean Bumgarner explaining his meetings with student leaders, the University submitted the affidavits of other officials, including that of University President George W. Johnson and Vice–President Earl G. Ingram. President Johnson, by his affidavit, presented the "mission statement" of the University:

(3) George Mason University is committed to promoting a culturally and racially diverse student body.... Education here is not limited to the classroom.

(4) We are committed to teaching the values of equal opportunity and equal treatment, respect for diversity, and individual dignity.

(5) Our mission also includes achieving the goals set forth in our affirmative action

---

2. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

plan, a plan incorporating affirmative steps designed to attract and retain minorities to this campus.

. . . .

(7) George Mason University is a state institution of higher education and a recipient of federal funds.

Vice President Earl G. Ingram's affidavit represented:

(6) The University's affirmative action plan is a part of an overall state plan designed, in part, to desegregate the predominately "white" and "black" public institutions of higher education in Virginia. . . . The behavior of the members of Sigma Chi that led to this lawsuit was completely antithetical to the University's mission, as expressed through its affirmative action statement and other pertinent University policies, to create a non-threatening, culturally diverse learning environment for students of all races and backgrounds, and of both sexes.

(7) While the University has progressed in attracting and retaining minority students, it cannot expect to maintain the position it has achieved, and make further progress on affirmative action and minority issues that it wishes to make, if behavior like that of Sigma Chi is perpetuated on this campus.

The district court granted summary judgment to Sigma Chi on its First Amendment claim, 773 F.Supp. 792 (E.D.Va.1991).

## II

The University urges that the district court's grant of summary judgment was premature. It stresses that there remain factual issues which the district court should have weighed in its conclusion. According to the University, the Fraternity's intent in staging the contest is crucial to the issue of whether its conduct was expressive. The University also stresses that if given time it could demonstrate more completely the harm the contest caused to its educational mission. It is, of course, beyond cavil that summary judgment should not be granted while a viable issue of material fact remains. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judg-

ment principles require the court to find that the evidence is such that a jury could not reasonably find for the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of a suit under the applicable law preclude entry of summary judgment.

In our view, for the reasons that follow, the district court was correct in concluding that there was no outstanding issue of material fact.

## III

We initially face the task of deciding whether Sigma Chi's "ugly woman contest" is sufficiently expressive to entitle it to First Amendment protection. From the mature advantage of looking back, it is obvious that the performance, apart from its charitable fund-raising features, was an exercise of teenage campus excess. With a longer and sobering perspective brought on by both peer and official disapproval, even the governing members of the Fraternity recognized as much. The answer to the question of whether the First Amendment protects the Fraternity's crude attempt at entertainment, however, is all the more difficult because of its obvious sophomoric nature.

## A

First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected. *See, e.g., Barnes v. Glen Theatre, Inc.,* — U.S. ——, ——, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (nude dancing); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557–58, 95 S.Ct. 1239, 1245–47, 43 L.Ed.2d 448 (1975) (musical "Hair"); *Berger v. Battaglia,* 779 F.2d 992, 999 (4th Cir.1985) (blackface performance), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986). As the Supreme Court announced in *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), "[e]ntertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment . . . fall

within the First Amendment guarantee." *Id.* at 65, 101 S.Ct. at 2180. Expression devoid of "ideas" but with entertainment value may also be protected because "[t]he line between the informing and the entertaining is too elusive." *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948).

■ Thus, we must determine if the skit performed by Sigma Chi comes within the constitutionally protected rubric of entertainment. Unquestionably, some forms of entertainment are so inherently expressive as to fall within the First Amendment's ambit regardless of their quality. For example, in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Supreme Court flatly ruled that "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Id.* at 790, 109 S.Ct. at 2753. Justice Kennedy explained:

> Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. The Constitution prohibits any like attempts in our own legal order.

*Id.* (citations omitted).

■ Motion pictures, too, are included within the free speech guarantee of the First Amendment. The Court emphasized in *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Id.* at 501, 72 S.Ct. at 780; *see also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976) (motion picture theaters involve communication protected by the First

Amendment, but the state can regulate their secondary effects).

■ Even crude street skits come within the First Amendment's reach. In overturning the conviction of an amateur actor for wearing a military uniform in violation of a federal statute, the Supreme Court discussed the statute's "theatrical production" exception.[3] *Schacht v. United States,* 398 U.S. 58, 61–62, 90 S.Ct. 1555, 1558–59, 26 L.Ed.2d 44 (1970). Responding to the Government's argument that the amateur skit was not a "theatrical production," Justice Black, writing for the majority, stated:

> It may be that the performances were crude and amateurish and perhaps unappealing, but the same thing can be said about many theatrical performances. We cannot believe that when Congress wrote out a special exception for theatrical productions it intended to protect only a narrow and limited category of professionally produced plays.

*Id.* Although this part of the opinion related to interpretation of the involved statute, Justice Black proceeded to declare that an actor participating in even a crude performance enjoys the constitutional right to freedom of speech. *Id.* at 63, 90 S.Ct. at 1559.

Bearing on this dichotomy between low and high-grade entertainment are the Supreme Court's holdings relating to nude dancing. *See Barnes v. Glen Theatre, Inc.,* — U.S. at —, —, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991); *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932–33, 95 S.Ct. 2561, 2568–69, 45 L.Ed.2d 648 (1975); *California v. LaRue,* 409 U.S. 109, 116–18, 93 S.Ct. 390, 395–97, 34 L.Ed.2d 342 (1972). Most recently, in *Barnes,* the Supreme Court conceded that nude dancing is expressive conduct entitled to First Amendment protection.[4] *Barnes,* — U.S. at —,

---

**3.** 10 U.S.C. § 772(f) provides:

> While portraying a member of the Army, Navy, Air Force, or Marine Corps, an actor in a theatrical or motion-picture production may wear the uniform of that armed force if the portrayal does not tend to discredit that armed force.

**4.** At least eight justices agreed that First Amendment protection extends to nude dancing, but they differed in their approaches to defining that protection. Justice Rehnquist, writing for a plurality, relied on the four-part test announced in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). He concluded that the Indiana statute prohibiting public nudity was

111 S.Ct. at 2460. In *Barnes*, the Court reviewed a Seventh Circuit opinion authored by Judge Flaum, *Miller v. Civil City of South Bend*, 904 F.2d 1081 (7th Cir.1990) (en banc), *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, — U.S. —, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), which thoroughly analyzed the questions of whether and how nude dancing is expression entitled to First Amendment protection. The *Miller* opinion noted that dance is inherently expressive entertainment, as it conveys emotions and ideas. Judge Flaum refused to distinguish "high" art from "low" entertainment on the asserted basis that low entertainment "fail[s] to communicate a defined intellectual thought." *Id.* at 1086. Applying the test enunciated in *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989),[5] he concluded that nude dancing communicated a message of eroticism and sensuality, understood by its viewers as such. *Miller*, 904 F.2d at 1087. Thus, notwithstanding its artistic quality, nude dancing was sufficiently expressive to entitle it to First Amendment protection. Justice White's dissent in *Barnes* echoed Judge Flaum's opinion:

> "[W]hile the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who ... wants some 'entertainment' with his beer or shot of rye."

*Barnes*, — U.S. at —, 111 S.Ct. at 2475, 115 L.Ed.2d at 529 (White, J., dissenting)

(quoting *Salem Inn, Inc. v. Frank*, 501 F.2d 18, 21 n. 3 (2d Cir.1974), *modified sub nom. Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)).

In sum, although the *Barnes* plurality did not explore these views, it appears that the low quality of entertainment does not necessarily weigh in the First Amendment inquiry. It would seem, therefore, that the Fraternity's skit, even as low-grade entertainment, was inherently expressive and thus entitled to First Amendment protection. *See Barnes*, — U.S. at —, 111 S.Ct. at 2460; *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981); *Schacht v. United States*, 398 U.S. 58, 61–62, 90 S.Ct. 1555, 1558, 26 L.Ed.2d 44 (1970).

### B

The University nevertheless contends that discovery will demonstrate that the contest does not merit characterization as a skit but only as mindless fraternity fun, devoid of any artistic expression. It argues further that entitlement to First Amendment protection exists only if the production was intended to convey a message likely to be understood by a particular audience. *See Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). From the summary judgment record, the University insists, it is impossible to discern the communicative intent necessary to imbue the Fra-

---

constitutional because it was unrelated to the suppression of speech, infringed only incidentally on protected expression, and furthered the important government interest of prohibiting public nudity. Justice Scalia concurred in the result, but wrote separately because he believed the statute regulated conduct, not expression. Justice Souter also wrote separately because he believed that the state's interest was to combat secondary effects, an interest unrelated to the suppression of expression. Justice White, joined by Justices Marshall, Blackmun, and Stevens, dissented, stating that the Indiana statute targeted the erotic message communicated by nude dancing. He would have applied a higher standard of scrutiny than the *O'Brien* test requires.

Because the sanctions imposed in this case targeted the message communicated by Sigma

Chi's skit and are thus related to the suppression of speech, we do not rely on the *O'Brien* balancing test as the *Barnes* plurality did.

**5.** In *Texas v. Johnson*, discussed *infra*, the Supreme Court stated:

> In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it."

*Johnson*, 491 U.S. at 404, 109 S.Ct. at 2539 (quoting *Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974)).

**392**

ternity's conduct with a free speech component.

■ As indicated, we feel that the First Amendment protects the Fraternity's skit because it is inherently expressive entertainment. Even if this were not true, however, the skit, in our view, qualifies as expressive conduct under the test articulated in *Texas v. Johnson.* It is true that the *Johnson* test for determining the expressiveness of conduct requires " '[a]n intent to convey a particularized message' " and a great likelihood " 'that the message would be understood by those who viewed it.' " *Id.* (quoting *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974)). As *Johnson* and *Spence* point out, however, the intent to convey a message can be inferred from the conduct and the circumstances surrounding it. Thus viewed, the University's argument is self-defeating. The affidavit from the University's Vice–President, Earl Ingram, stated that the message conveyed by the Fraternity's conduct—that racial and sexual themes should be treated lightly—was completely antithetical to the University's mission of promoting diversity and providing an educational environment free from racism and sexism. Dean Bumgarner, in his affidavit, stated that the University

> does not and cannot condone this type of on-campus behavior which perpetuated derogatory racial and sexual stereotypes, tends to isolate minority students, and creates a hostile and distracting learning environment. Such behavior is incompatible with, and destructive to, the University's mission of promoting diversity within its student body [and] sends a message to the student body and the community that we ... are not serious about hurtful and offensive behavior on campus.

Importantly, the affidavits establish that the punishment was meted out to the Fraternity because its boorish *message* had interfered with the described University mission. It is manifest from these circumstances that the University officials thought the Fraterni-

ty intended to convey a message. The Fraternity members' apology and post-conduct contriteness suggest that they held the same view. To be sure, no evidence suggests that the Fraternity advocated segregation or inferior social status for women. What is evident is that the Fraternity's purposefully nonsensical treatment of sexual and racial themes was intended to impart a message that the University's concerns, in the Fraternity's view, should be treated humorously. From the Fraternity's conduct and the circumstances surrounding it, we have no difficulty in concluding that it intended to convey a message.

As to the second prong of the *Johnson* test, there was a great likelihood that at least some of the audience viewing the skit would understand the Fraternity's message of satire and humor. Some students paid to attend the performance and were entertained. What the Fraternity did not anticipate was the reaction to their crude humor by other students on campus and University officials who opposed the racist and sexist implications of the Fraternity's skit.

■ Even considering, therefore, the sparsity of the evidentiary record, we are persuaded that the Fraternity's "ugly woman contest" satisfies the *Johnson* test for expressive conduct.[6]

### IV

■ If this were not a sufficient response to the University's argument, the principles relating to content and viewpoint discrimination recently emphasized in *R.A.V. v. City of St. Paul,* — U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), provide a definitive answer. Although the Court in *St. Paul* reviewed the constitutional effect of a city "hate speech" ordinance, and we review the constitutionality of sanctions imposed for violating University policy, *St. Paul*'s rationale applies here with equal force. Noting that St. Paul's city ordinance prohibited displays

---

**6.** We think this conclusion gains support from *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), in which the Supreme Court said that one factor weighing in the equation of whether conduct is expressive is "whether the activity in question is commonly associated with expression." *Id.* at 769, 108 S.Ct. at 2150. A live, albeit crude, skit performed for an audience is an activity commonly associated with expression.

of symbols that "arouse[ ] anger, alarm or resentment in others on the basis of race, color, creed, religion or gender," but did not prohibit displays of symbols which would advance ideas of racial or religious equality, Justice Scalia stated: "The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects." *Id.* at ——, ——, 112 S.Ct. at 2541, 2547.

As evidenced by their affidavits, University officials sanctioned Sigma Chi for the message conveyed by the "ugly woman contest" because it ran counter to the views the University sought to communicate to its students and the community.[7] The mischief was the University's punishment of those who scoffed at its goals of racial integration and gender neutrality, while permitting, even encouraging, conduct that would further the viewpoint expressed in the University's goals and probably embraced by a majority of society as well. "The First Amendment generally prevents government from proscribing ... expressive conduct because of disapproval of the ideas expressed." *Id.* at ——, 112 S.Ct. at 2542 (citing *Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540).

▪▪▪ The University, however, urges us to weigh Sigma Chi's conduct against the substantial interests inherent in educational endeavors. *See Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The University certainly has a substantial interest in maintaining an educational environment free of discrimination and racism, and in providing gender-neutral education. Yet it seems equally apparent that it has available numerous alternatives to imposing punishment on students based on the viewpoints they express.[8] We agree wholeheartedly that it is the University officials' responsibility, even their obligation, to achieve the goals they have set. On the other hand, a public university has many constitutionally permissible means to protect female and minority students. We must emphasize, as have other courts, that "the manner of [its action] cannot consist of selective limitations upon speech." *St. Paul,* —— U.S. at ——, 112 S.Ct. at 2548; *see also Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (invalidating a ban on residential picketing that exempted labor picketing); *Schacht v. United States,* 398 U.S. 58, 62–63, 90 S.Ct. 1555, 1559, 26 L.Ed.2d 44 (1970) (invalidating a law that allowed wearing military uniforms only in dramatic portrayals that did not "tend to discredit the military"). The First Amendment forbids the government from "restrict[ing] expression because of its message [or] its ideas." *Police Dept. v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). The University should have accomplished its goals in some fashion other than silencing speech on the basis of its viewpoint.

The decision of the district court is affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring in judgment:

While I agree with the majority's affirmance of the district court's grant of summary judgment, I feel that its reasoning goes unnecessarily too far. By holding that the First Amendment prohibits any action by a public university to prevent or punish offensive conduct like that at issue, the majority

---

7. Nor can we accept the University's contention that the sanctions were imposed as a result of the Fraternity's "pure conduct," unrelated to its communicative aspects or viewpoint. *See Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 702–05, 106 S.Ct. 3172, 3175–77, 92 L.Ed.2d 568 (1986); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 & n. 5, 104 S.Ct. 3065, 3069 & n. 5, 82 L.Ed.2d 221 (1984); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); *Kovacs v. Cooper,* 336 U.S. 77, 89, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949). The University's affidavits clearly point to the contrary conclusion.

8. In *St. Paul,* the Court rejected the Minnesota Supreme Court's pronouncement that St. Paul's "hate speech" ordinance was narrowly tailored to serve St. Paul's compelling interest in "ensur[ing] the basic human rights of members of groups that ha[d] historically been subjected to discrimination." *St. Paul,* —— U.S. at ——, 112 S.Ct. at 2549. Although the Court acknowledged that this interest was compelling, it concluded that the content discrimination contained in the ordinance was not "reasonably necessary to achieve St. Paul's compelling interests." *Id.*

goes much further than necessary, going beyond the facts of the instant case in order to reach a conclusion unsupported by First Amendment jurisprudence.

The present case can be decided easily within the contours of First Amendment law simply by holding that George Mason University's action violated the Fraternity members' rights by punishing them *post hoc* and in conflict with its tacit approval of their performance. Instead, the majority ranges far to discuss what it has concluded the law would be absent such permission. The majority opinion expounds upon the development of First Amendment doctrine and concludes that George Mason was absolutely forbidden from regulating speech based on its content. However, the Supreme Court has held repeatedly that a content-based regulation of protected expression survives judicial scrutiny if it " 'is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' " *Simon & Schuster, Inc. v. New York Crime Victims Board,* 502 U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987)). *Accord Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). Thus, the Supreme Court has recognized that regulation of speech based on its content is not only permissible but, in limited circumstances, justified.

In an attempt to reach a much broader conclusion, the majority cites from *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). Yet, the quoted passage from *Mosley* misrepresents its holding. The *Mosley* Court did not rule that Chicago's selective proscription of nonlabor picketing was *per se* unconstitutional, but rather indicated that the regulation would be valid if Chicago demonstrated that nonlabor picketing was "clearly more disruptive than [labor] picketing." 408 U.S. at 100, 92 S.Ct. at 2292. A complete reading of First Amendment jurisprudence reveals "that content-based distinctions, far from being presumptively invalid, are an inevitable

and indispensable aspect of a coherent understanding of the First Amendment." *R.A.V. v. St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2563, 120 L.Ed.2d 305 (1992) (Stevens, J. concurring).

George Mason's treatment of the Fraternity is not itself constitutionally flawed, because the University was concerned about the message of the students' performance, but because of the permission to give the performance which the University granted. The University, following the Fraternity's performance of the skit, meted out punishment to the Fraternity, without any prior indication that such behavior was not allowed at school-sanctioned events, and despite indicating that the Fraternity's skit had University approval.

Actually, forbidding the skit or requiring substantial amendment was not beyond its power. The University does have greater authority to regulate expressive conduct within its confines as a result of the unique nature of the educational forum. *Tinker v. Des Moines School District,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969) (holding that expressive activity in a school setting can only be restricted if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"); *see also Grayned v. City of Rockford,* 408 U.S. 104, 117–118, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222 (1972) (stating that the Court had never "suggested that students, teachers, or anyone else has an absolute right to use all parts of a school building or its immediate environs for his [or her] unlimited expressive purposes"); *cf. Widmar v. Vincent,* 454 U.S. 263, 276–277, 102 S.Ct. 269, 277–278, 70 L.Ed.2d 440 (1981).

In *Widmar,* Justice Stevens, concurring in judgment, has provided an insightful analysis of the special character of institutions of higher education:

> Today most major colleges and universities are operated by public authority. Nevertheless, their facilities are not open to the public in the same way that streets and parks are. University facilities—private or public—are maintained primarily for the benefit of the student body and the faculty. In performing their learning and

teaching missions, the managers of a university routinely make countless decisions based on the content of communicative materials. They select books for inclusion in the library, they hire professors on the basis of their academic philosophies, they select courses for inclusion in the curriculum, and they reward scholars for what they have written. In addition, encouraging students to participate in extracurricular activities, they necessarily make decisions concerning the content of those activities.

454 U.S. at 278, 102 S.Ct. at 278 (Stevens, J., concurring in judgment). In the present case, the University, by officially recognizing Greek-letter social organizations and participating in the planning of their events, inevitably has participated in the activities of those groups. Therefore, it must retain the ability to refuse to sanction certain behavior which infringes on the rights of other students. The University need not allow activity distinctly injurious to its objectives.

Certainly, the most fundamental concern of a university is to provide the optimum conditions for learning. The majority concedes that "the University certainly has a substantial interest in maintaining an educational environment free of discrimination and racism, and in providing gender-neutral education." Therefore, the University must have some leeway to regulate conduct which counters that interest, and thereby infringes upon the right of other students to learn. *See Tinker,* 393 U.S. at 513, 89 S.Ct. at 740; *cf. R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2565 (Stevens, J. concurring) ("A selective proscription of unprotected expression designed to protect 'certain persons or groups' would be constitutional if it were based on a legitimate determination that the harm created by the regulated expression differs from that created by the unregulated expression.").

By concluding that a university must be allowed to regulate expressive conduct which runs directly counter to its mission, I do not mean to imply that a university has the unrestricted power to silence entirely certain perspectives. I wholeheartedly believe that the free exchange of ideas and debate are fundamental to a place of learning. Yet, they comprise only part of a university's mission and must be balanced against a university's other interests, especially those interests which rise to the level of constitutional significance.*

Moreover, if the University, in advance, had refused to allow the Fraternity to perform its intended skit, the marketplace of ideas would hardly have been endangered. The Fraternity, if it wished, could have presented its ideas and perspectives on the value of women and Blacks in an open debate, allowing other students to challenge its perspective.

All in all, my concurrence rests on the unrevoked permission to give the skit. I find it unnecessary, and of doubtful validity, to suggest that, regardless of such approval, there was any First Amendment provision guaranteeing the right to give the skit, in circumstances under which it was inextricably linked with George Mason University.

---

* In a case decided one month prior to *R.A.V.,* the Supreme Court noted that among the most difficult First Amendment cases were those requiring a reconciliation of our commitment to free speech with our commitment to other constitutional rights. *Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992).

In *Burson,* the Court ultimately upheld the content-based regulation, namely, a Tennessee law prohibiting election-day political speeches within 100 feet of a polling place, holding that the State's interest in protecting the right to vote was sufficiently compelling.