WILKINSON, Chief Judge,
concurring in the judgment:
I agree with the majority that the Virginia Act is constitutional. Unlike the majority, I believe that this statute restricts matters of public concern, especially in the context of academic inquiry. The state, however, has a legitimate interest in preventing its employees from accessing on state-owned computers sexually explicit material unrelated to their work. Here the Commonwealth has promoted this legitimate interest through minimally intrusive means, ie., by permitting university officials to grant waivers for all bona fide research projects. By thps preserving the structure of university self-governance, the statute withstands constitutional scrutiny.
I write separately because the majority accords the speech and research of state employees, including those in universities, no First Amendment protection whatsoever. While the statute may ultimately be constitutional, the First Amendment does not slumber while the state regulates speech on matters' of vital public importance.
I.
Although the restrictions on Internet access in this statute may'appear to pose a novel question, I agree with- the majority that it is amenable to traditional analysis through the framework for public employee speech established in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). But because the statute at issue regulates a broad range of speech, its widespread impact “gives rise to far more serious concerns than could any single supervisory decision.” United States v. National Treasury Employees Union, 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (“NTEU’). Moreover, the Act’s restriction constitutes a prior restraint because it chills Internet research before it happens. Cf. Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Unlike Pickering and its progeny, the statute does not “involve a post hoc analysis of one employee’s speech and its impact on that employee’s public responsibilities.” NTEU, 513 U.S. at 467, 115 S.Ct. 1003. Rather, 'this statute involves a “wholesale deterrent tó a broad category of expression by a massive number of potential speakers.” Id. When the legislative scythe cuts such a broad swath through the field of public employee speech, Pickering and NTEU require us to carefully consider the First Amendment interests at stake.
The threshold inquiry in this case is whether the use of the Internet for academic research relates to a matter of “public concern.” Connick, 461 U.S. at 147, 103 S.Ct. 1684; Robinson v. Balog, 160 F.3d 183, 187-89 (4th Cir.1998); DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir.1995). To make this determination Connick requires that we closely examine the “content, form, and context” of the speech at issue. 461 U.S. at 147-48, 103 S.Ct. 1684.
While the majority undertakes this same inquiry, it goes astray -by placing exclusive emphasis on the fact that the statute covers speech of “state employees in their capacity as employees.” Whether speech is undertaken as a citizen or public employee is certainly relevant to the analysis. However, it is not the only inquiry. By *427 making it the dispositive criterion, the majority rests its conclusions solely on the “form” of the speech. The public concern inquiry, however, does not cease with form. The majority fails to examine the “content” of the speech, which surely touches on matters of political and social importance. It also fails to examine the “context” of the speech, which can occur in a variety of settings, including the public university. As this case was brought by public university professors, I consider the statute’s application to academic inquiry as a useful illustration of how the statute restricts material of public concern.[1] The content and context of the speech covered by this statute leave no doubt that the law in question affects speech on matters of public concern.
To take the matter of content first, if the speech at issue were primarily of personal workplace interest to the plaintiffs, it is clear that no First Amendment significance would attach to it. Public employee speech is not entitled to protection if it is of “purely personal concern to the employee — most typically, a private personnel grievance.” Berger v. Battaglia, 779 F.2d 992, 998 (4th Cir.1985) (internal quotation marks omitted). For instance, in Cormick, Assistant District Attorney Sheila Myers was informed that she would be transferred. 461 U.S. at 140, 103 S.Ct. 1684. She protested the transfer and distributed a questionnaire soliciting the views of her colleagues. She was then terminated because of her refusal to accept the transfer and her insubordination in distributing the questionnaire. See id. at 141, 103 S.Ct. 1684. The Supreme Court held that with but one exception the questions Myers asked did not touch on matters of public concern because they were nothing more than “mere extensions of Myers’ dispute over her transfer.” Id. at 148, 103 S.Ct. 1684. Similarly, in Terrell v. University of Texas System Police, the Fifth Circuit found that a police captain’s diary that was critical of a supervisor did not constitute speech on a matter of public concern. 792 F.2d 1360, 1362-63 (5th Cir.1986). And in Holland v. Rimmer, we found that internal employee discipline by a director of a county agency was not speech on a matter of public concern. 25 F.3d 1251, 1255-56 (4th Cir.1994). All of these cases involved speech that related to personal workplace disputes and did not involve “any matter of political, social, or other concern to the community.” Connick, 461 U.S. at 146, 103 S.Ct. 1684.
By contrast, speech found to be of public concern covers an array of subjects stretching beyond the narrow confines of personal workplace disputes. Courts have focused upon “whether the ‘public’ or the ‘community’ is likely to be truly concerned with or interested in the particular expression.” Berger, 779 F.2d at 999; see also Pickering, 391 U.S. at 573, 88 S.Ct. 1731 (emphasizing the “public interest in having free and unhindered debate on matters of public importance”). For example, in Pickering, a school teacher was dismissed for sending to a newspaper a letter that was critical of the Board of Education for the way it handled past proposals to raise new revenue for schools. 391 U.S. at 564, 88 S.Ct. 1731. The Court held that the letter touched on matters of “legitimate public concern” because on such questions of school funding “free and open debate is vital to informed decision-making by the electorate.” Id. at 571-72, 88 S.Ct. 1731. In NTEU, two unions and several career civil servants challenged a statute that forbade federal employees from accepting honoraria. 513 U.S. at 461, 115 S.Ct. 1003. The employees received compensation for speaking and writing on a variety of top *428 ics — a mail handler lectured on the Quaker religion, an aerospace engineer lectured on black history, and a microbiologist reviewed dance performances. See id. The Court found that these expressive activities “fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace.” Id. at 466, 115 S.Ct. 1003. The First Amendment thus affords public employee speech some umbrella of protection — those, however, with purely personal workplace disputes will get caught in the rain.
The statute at issue here addresses speech that is quite unrelated to personal grievances about the workplace. The content of academic inquiry involves matters of political and social concern because “academic freedom is of transcendent value to all of us and not merely to the teachers concerned.” Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Academic inqüiry is necessary to informed political debate. Academic curiosity is critical to useful social discoveries. One cannot possibly contend that research in socially useful subjects such as medicine, biology, anatomy, psychology, anthropology, law,- economics, art history, literature, and philosophy is not a matter of public concern. The content of this research does not involve a professor’s wages or working conditions. Rather it concerns an aggregate of subjects with broad social impact — subjects touching our physical health, our mental well-being, our economic prosperity, and ultimately our appreciation for the world around us and the different heritages that have brought that world about.[2] The right to academic inquiry into such subjects cannot be divorced from access to one means (the Internet) by which that inquiry- is carried out. By restricting Internet access, a state thus restricts academic inquiry at what may become its single most fruitful source.
Not only does the content of these academic fields support the conclusion that these are matters of public concern, the context of the affected speech is unique. In the university setting “the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.” Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 835, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Internet research, novel though it be, lies at the core of that tradition. These plaintiffs are state employees, it is true. But these particular employees are hired for the very purpose of inquiring into, reflecting upon, and speaking out on matters of public concern. A faculty is employed professionally to test ideas and to propose solutions, to deepen knowledge and refresh perspectives. See William W. Van Alstyne, Academic Freedom and the First Amendment in the Supreme Court of the United States: An Unhurried Historical Review, 53 Law & Contemp. Probs. 79, 87 (1990). Provocative comment is endemic to the work of a university faculty whose “function is primarily one of critical review.” Id.
Furthermore, state university professors work in the context of considerable academic independence. The statute limits professors’ ability to use the Internet to research and to write. But in their research and writing university professors are not state mouthpieces — they speak mainly for themselves. See generally David M. Rabban, Functional Analysis of “Individual” and “Institutional” Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 242-44 (1990). It is not enough to declare, as the majority does, “The speech at issue *429 here ... is clearly made in the employee’s role as employee.” Ante at 408-09. No one assumes when reading a professor’s work that it bears the imprimatur of the government or that it carries the approval of his or her academic institution. University research and writing thus differ fundamentally from secondary school curriculum selection, in which we have held that the desires of the individual teacher must give way to local school board policies. See Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 370-71 (4th Cir.1998) (en banc).[3] Curricular choices uniquely can be perceived by “students, parents, and members of the public ... to bear the imprimatur of the school.” Id. at 368 (internal quotation marks omitted).[4] The interest of the state in a professor’s research projects is simply not as all-encompassing.
The Commonwealth has nonetheless insisted that professors have no First Amendment interest in the content of their Internet research. It rests this breathtaking assertion on two props: that the professors are state employees, and that the computers are state-owned. See Appellant’s Br. at 12 (“The speech at issue here is speech by state employees in the performance of their governmental duties. This is not citizen speech; it is government speech.”); id. (“[T]he Act governs such speech only insofar as state employees seek to use state computers. This is a legitimate exercise of control by government over its own property....”).
Put simply, Connick does not support the Comfnonwealth’s leap. To begin and end the public concern inquiry with the signature on plaintiffs’ paychecks or the serial number on their computers would be to permit all manner of content and viewpoint-based restrictions on speech and research conducted in our universities. The Commonwealth acknowledges as much. See Appellant’s Reply Br. at 14. (“ ‘[G]overnment-as-speaker’ as well as ‘government-as-buyer’ may constitutionally engage in content and viewpoint discrimination.”). It cannot be true, however, that on university campuses the First Amendment places no limits on the Commonwealth’s proprietary prerogative — á prerogative that it claims here in sweeping terms. See id. at 29 (“[T]he Internet remains as free as the open sea and anyone who wishes may sail there; but the Commonwealth’s boats are the Commonwealth’s business, and no one can take them out without the Commonwealth’s permission.”). Under this view, if the Commonwealth were to declare that certain politically sensitive subjects could not be researched on state computers by state employees holding politically objectionable views, the statutory restriction must be upheld.
By embracing the Commonwealth’s view that all work-related speech by public em *430 ployees is beyond public concern, the majority sanctions state legislative interference in public universities without limit. The majority’s position would plainly allow the prohibition of speech on matters of public concern.[5] The worry over undue intrusion is not mere tilting at windmills— the Commonwealth’s original Internet access restrictions were stunning in their scope. For example, the Act originally barred access to all materials having “sexually explicit content” without regard to whether the depiction was “lascivious” or whether it constituted the material’s “dominant theme.” Compare Va.Code Ann. § 2.1-804 (Michie Supp.1998), with Va.Code Ann. § 2.1-804 . (Michie Supp. 1999). As the panel opinion noted, this restriction swept within its ambit “research and debate on sexual themes in art, literature, history, and the law; speech and research by medical and mental health professionals concerning sexual disease, sexual dysfunction, and sexually related mental disorders; and the routine exchange of information among social workers on sexual assault and child abuse.” Urofsky v. Gilmore, 167 F.3d 191, 195 n. 6 (4th Cir.1999). These are areas of more than mere personal interest. Speech in the social and physical sciences, the learned professions, and the humanities is central to our democratic discourse and social progress.
The majority’s reasoning could also be used to uphold statutes that otherwise would fall for overbreadth and vagueness. A prime example is speech codes that have the potential to suppress classroom speech that is unconventional or unorthodox. Courts have repeatedly invalidated these codes for trampling on ■ First Amendment freedoms. See Dambrot v. Central Mich. Univ., 55 F.3d 1177, 1182-84 (6th Cir.1995) (finding policy against discriminatory harassment unconstitutionally vague and overbroad); IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386, 393 (4th Cir.1993) (holding that university cannot maintain gender-neutral educational environment by silencing speech on the basis of viewpoint). These speech codes are often exceptionally broad. For instance, one university, code forbids “ ‘any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by ... demeaning or slurring individuals through ... written literature because of their racial or ethnic affiliation; or ... using symbols, [epithets] or slogans that infer negative connotations about the individual’s racial or ethnic affiliation.’ ” See Dambrot, 55 F.3d at 1182 (quoting the Plan for Affirmative Action at Central Michigan University). A statute could be passed that has similarly broad terms reaching substantial amounts of protected speech. Yet under the majority’s reasoning, such statutes would not implicate any First Amendment lights because they would regulate university professors only as state employees, and therefore would not involve matters of public concern. The majority provides no way to distinguish the statute at issue here from more intrusive future statutes. Under the majority’s rationale, whenever state employees are regulated as state employees, their speech lies outside the realm of “public concern.” Thus, regardless of the statute, there is no balancing of the com *431 peting First Amendment and state interests. This relegates academic speech to a First Amendment netherworld.
The Supreme Court has recognized that “the university is a traditional sphere of free expression ... fundamental to the functioning of our society.” Rust v. Sullivan, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Further, “[t]he essen-tiality of freedom in the community of American universities is almost self-evident.” Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). Thus the Commonwealth’s ownership of the plaintiffs’ computers or communication lines cannot end our analysis. Virginia also owns the chairs on which plaintiffs sit and the desks at which they work. But the Commonwealth does not thereby “own” their every thought and utterance. As cyberspace expands, web pages may provide more and faster access to information that will contribute to the understanding of social problems and ultimately to solutions for them. Insofar as public employees are concerned, the majority would allow the.state to shut down this informational resource at its whim. It is remarkable that Internet research with all its potential falls outside the majority’s conception of public concern. Discarding the ancient safeguards of the First Amendment is no way to welcome this modern technological development.
II.
Because the Act restricts speech on matters of public concern, we must determine whether the burden on speech is justified by the governmental interest at stake. See Pickering, 391 U.S. at 568, 88 S.Ct. 1731. Because of the widespread impact of the statute, “the Government’s burden is greater ... than with respect to an isolated disciplinary action” such as those considered in Connick and. Pickering. NTEU, 513 U.S. at 468, 115 S.Ct. 1003. The Commonwealth must show that the interests of plaintiffs and of society in the expression “are outweighed by [the] expression’s necessary impact on the actual operation of the Government.” Id. (internal quotation marks omitted). Whether judges happen to approve of this statute is not the question to be addressed under the Pickering/NTEU balance. We do not evaluate the enactment’s desirability, only its constitutionality. Our view of the wisdom of a state provision “may not color our task of constitutional adjudication.” Clements v. Fashing, 457 U.S. 957, 973, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).
WTiile I fully agree with my dissenting colleagues that the speech at issue here is of public concern, I part company with their balancing under the second part of the Connick analysis. There is no question that the General Assembly addressed a real, not a fanciful, problem when it enacted this statute. The record is replete with examples of Internet web sites displaying graphic forms of sexual behavior. See Urofsky v. Allen, 995 F.Supp. 634, 639 (E.D.Va.1998) (describing web site on university computer containing “graphic images of a nude woman in chains, a nude man with an erection, and a man and woman engaged in anal intercourse”). The posting of such mátérial on web sites in state offices has led to workplace disruption and complaints that such sexually graphic matter contributes to a hostile work environment. While such abuses may be confined to a small minority of employees, Virginia has an undisputed and substantial interest in preventing misconduct of this sort. Sexual harassment via computer is as objectionable in the university setting as it is in any workplace. The Commonwealth’s interest as an employer in workplace efficiency is similarly beyond question. See Pickering, 391 U.S. at 568, 88 S.Ct. 1731; Connick, 461 U.S. at 143, 103 S.Ct. 1684 (“[G]overnment offices could. not function if every employment decision became a constitutional matter.”).
The state thus has every right to require its employees to spend their workday energies on the functions for which it is paying them. As the Supreme Court has *432 stated, “Interference with work, personnel relationships, or the speaker’s job performance can detract from the public employer’s function; avoiding such interference can be a strong state interest.” Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). While many university employees doubtless have genuine scholarly interests in the study of sexual phenomena, for others the examination of sexually explicit matter may bear no relationship to any academic enterprise. As the Commonwealth argues, “Publication of materials in the workplace that colleagues find offensive and demeaning plainly harms workplace morale and detracts from the efficiency of the workforce.” Appellant’s Br. at 35. In a more general but still important sense, the ubiquity of sexual imagery may diminish employee self-control and debase the entire workplace environment. My dissenting colleagues, however, give little weight to the Commonwealth’s interest in the management of its own educational system and the running of its own workforce — surely important interests under our federal scheme of government.
On plaintiffs’ side of the balance, the Act, as noted, restricts access to material that potentially touches on matters of public concern. The recent revisions to the statute, however, have narrowed its scope considerably. As noted by the majority, the Act restricts the use of state owned or leased computer equipment to access any material “having sexually explicit content.” Va.Code Ann. § 2.1-805 (Michie Supp. 1999). As revised the statute defines “sexually explicit content” as: “content having as a dominant theme (i) any lascivious description of or (ii) any lascivious picture, photograph, drawing, motion picture film ... or similar visual representation depicting sexual bestiality, a lewd exhibition of nudity, ... sexual excitement, sexual conduct or sadomasochistic abuse, ... copro-philia, urophilia, or fetishism.” Id. § 2.1-804. Although the statute still limits access to some non-obscene information, it now restricts a more limited range of material — namely that which has as its dominant theme the lascivious depiction of nudity or sexual conduct.
Most importantly, through the waiver process the Commonwealth also accommodates the various interests at stake — barring employee access to lascivious material generally, but providing a procedure that can be invoked whenever educational institutions determine that academic freedom so requires. The significant state interest here is thus balanced against a minimal intrusion on academic inquiry. Under the Act, the ultimate judgment on whether a requested waiver is for a bona fide research project resides in the system of university governance. The statute grants “agency heads” the authority to approve these waivers. Id § 2.1-805. As a practical matter, it appears from the record that Virginia’s colleges and universities have delegated primary approval authority to. officials such as deans and department heads.
The Commonwealth thus maintains academic freedom by reposing critical authority within the university itself. The Supreme Court has noted that academic freedom “thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself.” Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (citations omitted). See also J. Peter Byrne, Academic Freedom: A “Special Concern of the First Amendment”, 99 Yale L.J. 251, 333 (1989) (defending institutional academic freedom based on “those research and humanistic values of a university that are unique to it”). Virginia’s statute fits within this model of university self-governance. In using the term university self-governance I do not intend to downplay the significant role of state government and boards of trustees with respect to state systems of higher education, but to underscore the *433 traditional role of deans, provosts, department heads, and faculty in making purely academic decisions.
It is this thread of institutional self-governance that ties our judgment today with Boring v. Buncombe County Board of Education, 136 F.3d 364 (4th Cir.1998) (en banc). In Boring we held that “school administrative authorities had a legitimate pedagogical interest in the makeup of the curriculum of the school.” Id. at 370. We reasoned that school boards must retain the “most basic authority to implement a uniform curriculum.” Id. at 373. In upholding the right of a school board to make curriculum decisions, we upheld as well the state’s legitimate interest in its secondary school governance structure. See id. at 368-69 (citing Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), and Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 800 (5th Cir.1989)). It is true that the governance structures of higher education and secondary education differ quite dramatically. The underlying approach of the court, however, should be the same. Where the state, as here, has worked within the traditional governance structure for educational institutions, the hand of the federal judiciary should ordinarily be stayed.
This is so for many reasons. It is well-established that federal courts have no business acting as surrogate university deans. Our “reluctance to trench on the prerogatives of state and local educational institutions,” Ewing, 474 U.S. at 226, 106 S.Ct. 507, is grounded in powerful notions of federalism and a healthy awareness of limited judicial competence in university administration. Federal courts are simply not “suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions.” Id.
Were we asked to review ex post the judgments of these academic deans and department heads with respect to individual waiver requests, we would thus act with extreme deference. And for good reason. The discretionary choices made by provosts, deans, and faculties in the contexts of hiring, tenure, curriculum selection, grants, and salaries all potentially burden individual academic freedom to some extent, but courts have generally been unwilling to second-guess these necessarily sensitive and subjective academic judgments. See Ewing, 474 U.S. at 225, 106 S.Ct. 507 (“When judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty’s professional judgment.”); University of Pa. v. EEOC, 493 U.S. 182, 199, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (“[Cjourts have stressed the importance of avoiding second-guessing of legitimate academic judgments.”). We should not presume ex ante that those same institutions will discharge their authority under this statute in an irrational or arbitrary fashion. I am thus not prepared to believe, as plaintiffs suggest, that a free academic institution will invade the freedoms of its own constituent members. In fact, the record reflects just the opposite — several professors have received research waivers from their colleges or universities upon request. We have not been made aware of any examples of professors whose requests for exemptions were denied.
The fact that this statute governs use of the Internet should not change our approach to institutional self-governance. The Internet allows unparalleled access to information, thereby enhancing opportunities for freedom of expression and holding tremendous promise for virtually all types of research. But with this exponential growth of freedom comes the potential for abuse. Whereas formerly access to sexually explicit matter was somewhat limited, now a click of the mouse can invite obscene material into the middle of the working environment.
When the danger of abuse is great, however, so also is the danger of unwarranted repression. There will be the temptation *434 to brand all public employees as miscreants because of the publicized misadventures of a few. This would be a mistake. “ ‘The greater the importance of safeguarding the community ... the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion....”’ Keyishian, 385 U.S. at 602, 87 S.Ct. 675 (quoting De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937)). The Commonwealth has made the judgment that universities themselves are best equipped to balance the enormous promise of the Internet against the novel risks that may accompany it. Because the limited restrictions in this Act are administered within the traditional structure of university governance, I do not believe the Virginia statute contravenes the Constitution.
III.
My fine colleagues in the majority and in concurrence take issue with the above approach. They claim I believe “professors possess a special constitutional right,” ante at 408 n. 7, that I am “emphatic that a new constitutional right must be created,” ante at 417 (Luttig, J., concurring), and that my “new-found right is reserved for professors alone,” ante at 417. I would, however, create no new right of any sort. I would simply review the form, content, and context of the speech at issue — something that the Supreme Court requires us to do in Connick and that the majority steadfastly refuses to do. The consequence of the majority’s failure could not be more serious. Under the majority’s view, even the grossest statutory restrictions on public employee speech will be evaluated by a simple calculus: if speech involves one’s position as a public employee, it will enjoy no First Amendment protection whatsoever. My colleagues in the majority would thus permit any statutory restriction on academic speech and research, even one that baldly discriminated on the basis of social perspective or political point of view.
The Supreme Court has eschewed such a reductionist view of First Amendment rights. By refusing to undertake a proper public concern inquiry under the first step of Connick and Pickering, the majority ensures that all statutes targeting public academic speech are immune from balancing in the second step. Thus, a court need never even examine the competing state and public employee interests at stake. But the Supreme Court has stated that “[although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests.” Connick, 461 U.S. at 150, 103 S.Ct. 1684. By upholding this statute on the first step of Connick/Picker-ing, the majority surrenders this balance to a world of absolutes.
The majority and concurrence also characterize my approach as one of academic privilege. They contend I believe that “professors possess a special constitutional right of academic freedom,” ante at 408 n. 7, and that “the academy has a special contribution to make to society,” ante at 417 (Luttig, J., concurring).
But the Supreme Court itself has emphasized that “academic freedom ... is of transcendent value to all of us and not merely to the teachers concerned.” Keyishian, 385 U.S. at 603, 87 S.Ct. 675 (emphasis added). Indeed, “[t]he essentiality of freedom in the community of American universities is almost self-evident.” Sweezy, 354 U.S. at 250, 77 S.Ct. 1203 (emphasis added). By its talk of special rights and privileges, I fear the majority somehow sees academic speech and democratic values as inconsistent or at odds. With all respect, this need not be our view. I had always supposed that democracy and speech, including academic speech, assisted one another and that democracy functioned best when the channels of discourse were unfettered. It would be folly to forget this fundamental First Amendment premise in complex times when change of *435 every sort confronts us. Those who have worked to acquire expertise within their given fields can aid popular representatives in reaching decisions and in shaping an informed response to rapid change. Democratic representatives may often choose to reject academic proposals, but rejection, not suppression, is the constitutionally tested course. In all events, for speech to function usefully and creatively it cannot be subject, as my colleagues in the majority would now have it, to the unexamined legislative will. “One’s right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.” West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
The majority undertakes an extended discussion of academic speech, because public university professors are the plaintiffs before us. But the majority concludes, without any proper content-context inquiry, that such speech can never be of public concern. This dismissal is something we shall come to regret. I recognize that academic speech may well appear at times to be petty, “politically correct,” or floating far beyond reality. But to see it as only that is to slip too easily into stereotype. Academic views on any subject are often varied, and it remains an abiding challenge to democratic leadership to understand what is misguided and naive about expert opinion and what is sound and wise. I offer no apology for believing, along with, the Supreme Court in Keyishi-an, Sweezy, and Rosenberger, in the significant contribution made to society by our colleges and universities. That contribution, however, is but one of many made from all walks of national- life. Elected officials, labor leaders, industrialists, farmers, entrepreneurs, social workers, religious leaders, parents and teachers, the self-employed and the unemployed all make their contribution to the broad river of American speech, and I would not shut off any stream or tributary. The source from which speech flows should not mark it for judicial disfavor. I fear the court forgets that freedom of speech belongs to all Americans and that the threat to the expression of one sector of society will soon enough become a danger to the liberty of all.

. Appellees here are public university professors who raised both facial and as-applied challenges to the statute. To prevail on their facial challenge, plaintiffs “must establish that no set of circumstances exists under which the Act would be valid.” Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (internal quotation marks omitted). By finding the statute valid as applied to these plaintiffs, the facial challenge fails as well.

. As such, a statute of general applicability differs from individual disputes over hiring, tenure, and promotion, which courts have routinely regarded as matters of personal workplace rather than public concern. See, e.g., Lovelace v. Southeastern Mass. Univ., 793 F.2d 419, 425-26 (1st Cir.1986); Megill v. Board of Regents of the State of Fla., 541 F.2d 1073, 1085 (5th Cir.1976).

. It should go without saying that I adhere to my vote and views in Boring v. Buncombe County Board of Education, 136 F.3d 364 (4th Cir.1998) (en banc), see also id. at 371-72 (Wilkinson, C.J., concurring). The distinctions between that case and this one, however, are numerous. Boring involved an individual employment decision pertaining to curriculum at the secondary school level. By contrast, this case involves a broadly applica- . ble statute unrelated to curriculum at the level of higher education. To find that the statute in this case impacts non-curricular speech in colleges and universities and that such speech is a matter of public concern in no way weakens the Boring holding.

. In his concurring opinion, my brother Lut-tig thus wrongly asserts that “Boring, of course, did not rest upon any such notion of official imprimatur.” Ante at 424. Indeed, courts dealing with the question of First Amendment rights concerning curriculum choices have limited their holdings to curriculum'matters in Tight of the distinctly institutional character of curriculum decisions: "[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom.” Edwards v. California Univ. of Pa., 156 F.3d 488, 491 (3d Cir.1998). "Although the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public' school curricula.” Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 800 (5th Cir.1989).

. The majority’s hypothetical involving an assistant district attorney serves further to illustrate the drawbacks of its approach. In focusing once again solely on the form of speech, the majority ignores the different context between its hypothetical and the present case. Assistant district attorneys operate under a chain of supervision and command and their words would be taken to represent the government’s position on a given matter. This 'differs so dramatically from the context of the present speech that it is hard to believe that the majority would even seek to draw a comparison. All this is quite apart from the fact that the majority’s assistant district attorney hypothetical represents an individual employment matter that (academic or otherwise) is less likely to involve matters of public concern than a broad statutory restriction on speech.