Melvin I. UROFSKY, et al., Plaintiffs,

v.

George ALLEN, Governor of the Commonwealth of Virginia, Defendant.

Civil Action No. 97–701–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 26, 1998.

Mary Catherine Bauer, A.C.L.U. of Virginia, Richmond, VA, for Plaintiffs.

Alison Paige Landry, Office of the Attorney General, Richmond, VA, for Defendant.

### MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court are the parties' cross-motions for summary judgment, in a case concerning the constitutionality of Va.Code § 2.1–804 *et seq.*, entitled "Restrictions on State Employee Access to Information Infrastructure" ("the Act"), which restricts the ability of state employees to access sexually explicit material on state-owned or leased computers.

### I.

The plaintiffs are professors at various Virginia state colleges and universities, who allege that the Act unconstitutionally interferes with their research and teaching. For example, plaintiff Urofsky has been reluctant to assign students online research assignments on "indecency" law because of the Act; Smith's website containing materials on gender roles and sexuality has been censored as a result of the Act; Meyers is concerned about his ability to access the Commonwealth's own database of sexually explicit poetry to continue his studies on the "fleshy school" of Victorian poets; Heller has stopped using the Internet to continue her research on lesbian and gay studies; and Levin and Delaney are reluctant to use the Internet to continue their psychological research on human sexual experience. Plaintiffs contend that the Act, which became effective on July 1, 1996, violates their First Amendment right to free speech, and ask this Court to grant them summary judgment invalidating the Act. Defendant argues in response that the Act is a legitimate limitation of the speech of government employees,

and asks the Court for summary judgment affirming the Act's validity.

Section 2.1–805 of the Act provides that:

Except to the extent required in conjunction with a bona fide, agency-approved research project or other agency-approved undertaking, no agency employee shall utilize agency-owned or agency-leased computer equipment to access, download, print or store any information infrastructure files or services having sexually explicit content. Such agency approvals shall be given in writing by agency heads, and any such approvals shall be available to the public under the provisions of the Virginia Freedom of Information Act.

Section 2.1–804 defines "sexually explicit" content broadly to include:

(i) any description of or (ii) any picture, photograph, drawing, motion picture film, digital image or similar visual representation depicting sexual bestiality, a lewd exhibition of nudity, as nudity is defined in § 18.2–390, sexual excitement, sexual conduct or sadomasochistic abuse, as also defined in § 18.2–390, coprophilia, urophilia, or fetishism.[1]

Section 18.2–390 of Virginia's Criminal Code provides further definitions for the Act:

"Nudity" means a state of undress so as to expose the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state.

"Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"Sexual conduct" means actual or explicitly simulated acts of masturbation, homosexuality, sexual intercourse, or physical con-

---

1. The same section also contains the following definitions:

"Agency" means any agency, authority, board, department, division, commission, institution, institution of higher education, bureau, or like governmental entity of the Commonwealth, except the Department of State Police.

"Information Infrastructure" means telecommunications, cable, and computer networks

and includes the Internet, the World Wide Web, Usenet, bulletin board systems, on-line systems, and telephone networks.

This latter definition might actually reach the standard office telephone if those phones are part of a computerized telecommunication system.

tact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, public area, buttocks, or, if such be female, breast. "Sadomasochistic abuse" means actual or explicitly simulated flagellation or torture by or upon a person who is nude or clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

Although the Act restricts the ability of state employees to research, speak on, or receive information concerning sexually explicit topics via state computers, it does not completely prohibit such activities. Instead, the Act permits an employee to access sexually explicit material only after receiving written approval from the appropriate agency head who may grant such approval only if the proposed use is "required" in connection with a "bona fide" research project or undertaking. *See* Va.Code § 2.1–805.

## II.

*The Applicable Standard of Review for Speech by Government Employees*

When government employees speak on matters of public concern their speech is entitled to First Amendment protection under the standard set forth in *Pickering v. Board of Education. See* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also Connick v. Myers,* 461 U.S. 138, 147–49, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (speech of public employees on matters of merely private concern such as personal employment grievances is unprotected). Under the *Pickering* standard, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568. This balancing test applies equally to speech within the workplace as it does to speech outside it. *See Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (*Pickering* balancing applied to employee's on-the-job statements).

The Act's broad definition of "sexually explicit" content obviously includes obscene speech, that is, speech which lacks "serious literary, artistic, political, or scientific value;" that is "patently offensive;" and appeals primarily to a "prurient interest." *See Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Such speech does not enjoy First Amendment protection. However, the Act also applies to sexually explicit speech that is normally protected. For example, the Act's broad definition of "sexually explicit" content would include research and debate on sexual themes in art, literature, history and the law, speech and research by medical and mental health professionals concerning sexual disease, sexual dysfunction, and sexually related mental disorders,[2] and the routine exchange of information among social workers on sexual assault and child abuse. Much of this information can be expected to be of benefit to the public. Indeed, the Supreme Court has expressly stated that sex is "one of the vital problems of human interest and public concern." *Roth v. United States,* 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). As such, the speech of state employees on sexually explicit topics includes speech on matters of public concern entitled to First Amendment protection under the *Pickering* balancing test.

The Commonwealth argues that "state employee computer use is not protected speech under the First Amendment because the employees are acting in their capacities as government employees, not public citizens." (Memo at 8). To support this position, the Commonwealth relies on *DiMeglio v. Haines,* 45 F.3d 790, 805 (4th Cir.1995) and *Boring v. Buncombe County Board of Education,* 136 F.3d 364 (4th Cir.1998) (en banc). Both cases and *Pickering* focused on whether after-the-fact discipline of a public employee by a government employer violated the employee's First Amendment free speech rights. They did not address, as we must here, a broad statute which prospectively addresses the speech of over 100,000 public employees. Indeed, as the *DiMeglio* court

2. Indeed, the Act specifically refers to fetishism, coprophilia and urophilia, all of which are recognized as sexual disorders by the American Psychological Association in its *Diagnostic and Statistical Manual, Fourth Edition. See* Va.Code § 2.1–804; Plaintiff's Statement of Undisputed Facts ("S.U.F.") ¶ 84.

recognized, the relevant inquiry as to whether a public employee's speech on a matter of public concern is protected "requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well defined." *DiMeglio* 45 F.3d at 806 (citing *Connick*, 461 U.S. at 150).

Because the Act before us establishes a prospective deterrent "to a broad category of expression by a massive number of potential speakers," *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (hereinafter "*NTEU*"), the government's justification for the restriction must be correspondingly higher. *Id.* at 468 (such a restriction "gives rise to far more serious concerns than could any single supervisory decision"). In addition, the Supreme Court has recognized a difference between "adverse action taken in response to actual speech," and an up-front restriction like that found in the Act, which "chills potential speech before it happens." *Id.* (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)). This feature of the Act also necessarily increases the government's burden. Moreover, prospective restrictions on public employee speech impact heavily "on the public's right to read and hear what the employees would otherwise have written and said." *Id.* at 470. This lost public benefit is particularly great where a government employee speaks on matters of which she has specialized knowledge. *See Sanjour v. EPA*, 56 F.3d 85, 94 (D.C.Cir.1995) (en banc) ("[A]s numerous courts and commentators have observed, government employees are in a position to offer the public unique insights into the workings of the government generally and their areas of specialization in particular."); *see also Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Accordingly, the public's interest in receiving the speech of government employees must also be weighed against the govern-

ment's interest in a challenged restriction. To address these concerns, the Supreme Court expanded the *Pickering* test and held in *NTEU* that when the government broadly restricts public employee speech, it has the burden of establishing that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571).[3]

In the instant case, application of the *Pickering/NTEU* test is further complicated by the Act's discrimination against sexually explicit content. The Supreme Court has made it clear on numerous occasions that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *see also Turner Broadcasting v. F.C.C.*, 512 U.S. 622, 641–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("*Turner I*"). Underlying this principle is the recognition that "content-based burdens on speech raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). To justify such restrictions, the government must demonstrate a compelling interest, and the restrictions must be narrowly tailored to meet that objective. *See Simon & Schuster*, 502 U.S. at 118.[4] Despite this long line of well-established First Amendment precedent, defendant argues that the content-discriminatory nature of the Act does not increase its burden under the *Pickering/NTEU* balance. In support, defendant cites *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, ——, 116 S.Ct. 2342,

---

**3.** In *NTEU*, government employees challenged a provision of the Ethics in Government Act which prohibited them from receiving honoraria in connection with unofficial speaking engagements. *Id.* at 454. Applying the test set forth above, the Court concluded that the restriction imposed an unconstitutional burden on the free speech rights of federal employees. *Id.; see also Sanjour*, 56 F.3d at 85.

**4.** Indeed, Justice Kennedy has argued persuasively that a regulation that discriminates on the basis of content is *per se* invalid and that "[n]o further inquiry is necessary to reject the State's argument that [such a] statute should be upheld." *Id.* at 124 (Kennedy, J., concurring).

2348, 135 L.Ed.2d 843 (1996). *Umbehr,* like *Pickering,* involved a single adverse employment action taken by the government against an individual on account of his speech. It did not involve a content-based prior restraint affecting thousands of government employees. Consequently, the application of *Umbehr* to the present action is limited. Nevertheless, we recognize the general principle underlying *Umbehr* that the government may undertake actions as an employer that are forbidden to it as sovereign. *See id.* at ——, 116 S.Ct. at 2349.[5] Accordingly, rather than requiring the government to satisfy strict scrutiny review, as would be appropriate were the government acting solely as sovereign, we instead treat the Act's content discrimination as yet another factor to be considered in applying the *Pickering/NTEU* balancing test.

### The Interest of State Employees and Potential Audiences

At stake is the ability of more than 101,000 public employees at all levels of state government to read, research, and discuss sexually explicit topics within their areas of expertise. This includes inquiry and debate by academics in the fields of art, literature, medicine, psychology, anthropology, and law, and the exchange of sexually explicit information and opinions by employees in Virginia's Departments of Corrections, Social Services, Juvenile Justice, and Mental Health, and the Office of the Commonwealth's Attorney General. Indeed, in the instant case, the Commonwealth's own attorneys were required to obtain written agency approval to make use of the Internet material they have identified as "sexually explicit" before they could submit it with their pleadings. (Plaintiff's Ex. 34).

Equally at stake is the right of the public to receive and benefit from the speech of state employees on matters within their areas of expertise. *See NTEU,* 513 U.S. at 470; *Sanjour,* 56 F.3d at 94. As the Supreme Court explains, "Our precedents have focused 'not only on the role of the First Amendment in fostering individual self-ex-

pression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas.'" *Board of Edu. v. Pico,* 457 U.S. 853, 866, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (quoting *First Nat'l Bank of Boston v. Belloti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). Contrary to defendant's assertion, the interests of potential audiences are an essential part of the *Pickering/NTEU* balance. *See NTEU,* 513 U.S. at 468. Here, as in *NTEU,* the statute at issue impacts heavily "on the public's right to read and hear what the employees would otherwise have written and said." *Id.* at 470. As noted above, "public employees, by virtue of their expertise and experience, are often among the citizens who are the best informed ... their opinions are thus especially valuable to the public." *Developments in the Law— Public Employment,* 97 HARV. L. REV. 1611, 1768 (1984). Moreover, by targeting the use of computers, the Act necessarily restricts use of the Internet, arguably the most powerful tool for sharing information ever developed. *See generally Reno v. ACLU,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (describing the uses and potential of the Internet, and noting with approval the observation of the district court that "[i]t is no exaggeration to conclude that the content of the Internet is as diverse as human thought"). In doing so, the Act increases the burden both on the research and speech of state employees and on the public's ability to benefit from that research and speech. Given the public and employee interests described above, we agree that "[d]epriving ... the general populace of government employees' novel and valuable perspective ... require[s] a serious and carefully considered justification." *Sanjour,* 56 F.3d at 94.

### The Commonwealth's Asserted Interests in Workplace Efficiency and Avoiding Hostile Work Environment Claims

Under the *Pickering/NTEU* standard, the government must demonstrate not only that the harms it asserts are "real, not merely

---

**5.** In *Umbehr,* a government contractor argued that the County was required to satisfy strict scrutiny review when it retaliated against him because he publicly criticized County officials. The Court disagreed, holding that plaintiff's status as an independent contractor did not exempt him from the *Pickering/NTEU* balancing test applied to government employees because in both cases the government acts as a contractor for services rather than as sovereign. *See id.*

conjectural," but also that the statute used to address them is a "reasonable response to the threat" which will alleviate the harms "in a direct and material way." *NTEU*, 513 U.S. at 474–75 (quoting *Turner I*, 512 U.S. at 624). The *Sanjour* court has interpreted the "reasonable response" requirement to mean that "[i]n performing the Pickering balance, ... the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Sanjour*, 56 F.3d at 97.

The Commonwealth asserts that the Act's restriction of sexually explicit speech is necessary in order to: (1) maintain operational efficiency in the workplace; and (2) prevent the creation of a sexually hostile work environment. As evidence that sexually explicit speech disrupts workplace functions, the Commonwealth describes five incidents in which employees used state computers to view or display sexual images unrelated to their work. *See* Def. Exs. 3–7. In some of these incidents, employees or students exposed to sexually explicit material were offended and complained to supervisors or departmental officials. For example, a Library of Virginia employee who observed a co-worker viewing "homosexual pornography" was offended, and complained to a supervisor. (Def.Ex. 3). In another example, a female student observed an image of a nude woman on a professor's computer when she approached him with class-related questions; the student complained to her advisor and attempted to drop the class. (Def.Ex. 6). One student complained to a departmental official that a visiting professor was storing child pornography on a state computer; the professor was asked to resign immediately and did so. The university referred the matter to the appropriate prosecutor's office. (Def.Ex. 7). In another incident, the Commonwealth had to remove sexually explicit material from several state computers. (Def.Ex. 5).

As evidence that sexually explicit speech is likely to result in a hostile work environment, defendant points to a website maintained by Paul Smith, one of the plaintiffs in this action. The website is maintained on a state computer at a state university, and contains, among other materials, graphic images of a nude woman in chains, a nude man with an erection, and a man and woman engaged in anal intercourse. *See* Def. Ex. 1, attachment 1. Smith contends that the images were intended as part of a discussion about censorship, pornography and capitalist control of the Internet. However, several students and at least one faculty member visited the site, were offended by the pictures they saw there, and complained to John O'Connor, vice-provost for information technology at the university. *See* Def. Ex. 1 at 118–132. Angry discussion concerning the images was "all up and down [the] hall" and had become a "big deal" by the end of the week. *See* Pl.Ex. 1 at 137–38, 178–79. In response to these complaints, O'Connor initially blocked access to several images, but later restored some of them. *See id.* at 123–26, 170–73.

We are not unsympathetic with the government's concern about the potential of such incidents to impair workplace efficiency. Employees viewing sexual images unrelated to their work are neglecting the duties they were hired to perform, causing a loss of productivity. Such images may also distract and offend co-workers. Finally, the Commonwealth must spend time and money dealing with complaints, disciplining employees, and removing frivolous materials from state computer equipment. Certainly, the government is entitled to guard the productivity of its employees against distraction. Likewise, the Commonwealth has a right, as well as a legal duty, to avoid the creation of a hostile work environment.

Ultimately, however, the strength of the government's asserted interests must be evaluated in terms of the statute it has crafted to address them. In the instant case, we find that the Act is both fatally overinclusive and underinclusive; and that this "obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions" casts "serious doubt" on the government's asserted need for the statute. *See Sanjour*, 56 F.3d at 95; *see also Carey v. Brown*, 447 U.S. 455, 465, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (a statute's over- and under-inclusiveness "undermine [the] claim that the prohibition ... can be justified by reference to the State's interest"). Moreover, the harms asserted by the Commonwealth appear to be adequately addressed by

existing content-neutral enforcement mechanisms. This further undercuts the Commonwealth's asserted justifications for the Act. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute.)" (quoting *Boos v. Barry*, 485 U.S. 312, 329, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)). We discuss each of these findings in turn.

*Underinclusiveness*

■ The Commonwealth claims that the Act is needed to avoid workplace disruption and ensure employee efficiency. However, the Act targets only those distractions that are sexual in nature. Thus, the Act ignores the limitless variety of disruptive computer activities unrelated to viewing sexually explicit material, including, but not limited to, accessing online video games, news services, stock quotes and financial information, chat rooms, and shopping sites. Nor does the Act address the sending and receiving of e-mail on non-work-related topics. Strangely, Virginia state police are exempt from the Act. *See* Va.Code. Ann. § 2.1–804. Defendant does not explain why state police are less susceptible to the temptations posed by sexually explicit material than doctors, social workers, academics, lawyers and other state employees who are subject to the Act.

The Commonwealth also claims that the Act is needed to avoid hostile workplace claims. However, the Act fails to address racially, ethnically or religiously offensive material, which would also give rise to such claims. *See* 42 U.S.C. § 2000e–2(a)(1). Nor does the Act effectively guard against gender-based hostile workplace claims, because it does not reach material which is blatantly hostile and derogatory toward women, but lacks sexually explicit content. Furthermore, the Act targets only a single medium, electronic communication, ignoring printed displays of material such as "pin up" calendars of nudes which might create a sexually hostile environment. Thus, an employee forbidden from accessing explicit sexual scenes on his office computer might leave a book open displaying the exact same images with-

out running afoul of the Act. Indeed, the case law relied upon by the Commonwealth to show that the display of sexually explicit material can create a hostile work environment involves verbal and printed, not electronic, displays of sexual material. *See Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216 (8th Cir.1997); *Winsor v. Hinckley Dodge*, 79 F.3d 996 (10th Cir.1996).

*Overinclusiveness*

■ The Act is also overinclusive. By categorically restricting all computer use involving sexually explicit material, the Act interferes with countless work-related endeavors by state employees dealing with sexuality and the human body. As discussed above, some of these are academic in nature, and deal with sexual themes in art, literature, history, and philosophy. Others are more practical and concern topics such as prison rape, pedophilia, AIDS and other sexually transmitted diseases. *See generally* Plaintiffs' Statement of Undisputed Facts ("S.U.F.") ¶ 99–126 (work-related sexually explicit topics at risk under the Act). In so doing, the Act not only burdens those employees who wish to speak or educate the public on topics within their areas of expertise, it also inhibits such employees from obtaining the information needed to inform their views.

The Act also imposes restrictions on speech beyond what is necessary to prevent sexual harassment or a sexually hostile work environment. Indeed, the Act prevents speech on matters unrelated to sex at all. For example, the Act prohibits depictions of sadomasochistic abuse, which the Act defines as "actual or explicitly simulated ... torture by or upon a person who is nude or clad in undergarments." *See* Va.Code Ann. § 2.1–805; 18.2–390. Thus, a history professor's research on Argentina's Dirty War or human rights abuses in Guatemala might be banned under the Act, despite the fact that the speech was completely unrelated to sex or gender. Furthermore, existing case law recognizes that the mere presence of sexually explicit materials in the workplace does not foster a hostile work environment or otherwise violate gender discrimination laws.[6] *See*

---

6. Likewise, the actions of Paul Smith, on which defendant heavily relies, do not present a viable

hostile work environment claim. The Commonwealth has cited no cases to support its conten-

*Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 66–69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Dwyer v. Smith,* 867 F.2d 184, 188–89 (4th Cir.1989). Ironically, a significant portion of the sexually explicit material restricted by the Act is available in the Commonwealth's own Virtual Library of Virginia ("VIVA"). *See* Plaintiffs' S.U.F. ¶ 114. This collection of databases was created to assist state professors and researchers in the performance of their scholarly duties. *See* Hurt Decl. ¶ 8; Def. Ex. 1 (O'Connor Dep.) at 29–30; Plaintiffs' S.U.F. ¶ 28. Similarly, many state agencies maintain work-related databases containing sexually explicit material. *See* Plaintiffs' S.U.F. ¶ 112–13, 122–26. Moreover, students attending state colleges and universities may freely access the very same materials for which their professors must gain written permission because the Act does not apply to students. At least one of the plaintiffs claims he has removed assignments from his syllabus because he would be unable to confirm the Internet research of his students on sexually explicit topics. *See* Plaintiffs' S.U.F. ¶ 36 (Urofsky, plaintiff, removed assignments on the recently approved Communications Decency Act); *see also* Plaintiffs' S.U.F. ¶ 94–95 (Act may prevent Delaney, also a plaintiff, from confirming a student's research on Nabokov's *Lolita*).

*Prior Approval*

 In arguing for the constitutionality of the Act, the Commonwealth states that the Act imposes only a minimal burden on present and future employees, because it "authorizes state employees to access sexually explicit materials that are work related," subject to the Act's approval process. (Memo at 11). To support that argument, the Commonwealth states that the standard for approval is that the sexually explicit information be work related. "Thus, under the Act, the agency head rather than the employee decides whether the project is *work related.* If the project is *work related,* the agency head approves it. The Act does nothing more than require that the employees' use be *work related.*" *Id.* (emphasis added).

In fact, the Commonwealth has misread the Act, which speaks not in terms of the more general concept of "work related" but rather uses the more restrictive word "required." Thus, access of sexually explicit material is permitted only "to the extent *required* in conjunction with a bona fide, agency-approved research project or other agency-approved undertaking." (emphasis added). Under a literal reading of this Act, approval of access to sexually explicit material that is work related, but not required, could be denied. To further complicate matters, the Act qualifies "agency-approved research projects and other agency approved undertakings" by adding the word "bona fide," thereby leaving open the possibility that there could be agency-approved projects that were somehow not bona fide. Moreover, Agency approvals of sexually explicit speech "shall be available to the public under the provisions of the Virginia Freedom of Information Act," a not-so-veiled threat to the agency head who approves such speech. Lastly, the Act does not provide for appeals of agency decisions. Thus, if an agency head were to turn down a request, the employee would appear to have no recourse and potentially both the employee and the public would be denied the benefit of that access. Given the Act's strict qualifications and the absence of clear criteria under which a department head may determine what is "required" and "bona fide," the Act places unbridled discretion in the hands of state administrators. The Supreme Court has held that such grants of unfettered discretion can be expected to invite arbitrary enforcement and to

---

tion that a female employee's voluntary decision to access sexual material not on display in the workplace can be construed as sexual hostility directed against that employee. Indeed, the cases cited uniformly hold that sexually hostile speech must be part of the work environment to be actionable and must rise to a level sufficiently severe and pervasive as to create an abusive workplace. *See Caviness,* 105 F.3d at 1221; *Winsor,* 79 F.3d at 1000; *see also Harris v. Fork-*

*lift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (discussing elements of hostile work environment claims); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (same). It is perhaps for this reason that no claim of sexual harassment or a hostile work environment has been filed in connection with Smith's website, which apparently continues to offer images defendant considers "sexually explicit."

chill the free exercise of speech rights. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 763, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *see also Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) ("It is not merely the sporadic abuse of power by the censor but the pervasive threat in its very existence that constitutes the danger to freedom of discussion."). Indeed, the Act's requirement that approval decisions regarding sexually explicit materials be made public under Virginia's Freedom of Information Act suggests that this was in fact the purpose of the approval provision.

Moreover, implementation of the approval process has proven problematic. On the one hand, the paperwork associated with approval requests appears to be minimal, and approvals, when granted, are granted swiftly, some within twenty-four hours. *See* Def. Ex. 10 (professor's approval request for project on the nature of censorship granted within twenty-four hours); Pl.Ex. 36 (two-sentence request for access to sexually explicit ancient art granted within forty-eight hours). Since the Act became law in 1996, however, only three of Virginia's thirty-nine institutions of higher learning have received requests for approvals under the Act.[7] Similarly, only three state agencies, the Department of Education, the Virginia Museum of Fine Arts, and the Office of the Attorney General, appear to have received approval requests under the Act. *See* Plaintiffs' S.U.F. ¶ 147. Excluded from this list are the Department of Corrections, the Department of Health, the Department of Juvenile Justice, the Department of Social Services, the Department of Mental Health, Mental Retardation and Substance Abuse Services, the Library of Virginia, and other state agencies whose employees presumably make frequent use of sexually explicit information. *See id.;* Pl.Ex. 14. Furthermore, the University of Virginia, one of the few academic institutions to have processed approval requests, has granted some of its departments blanket approvals.

*See* Plaintiff's S.U.F. ¶ 149–54. For example, the University has granted 8,300 employees at the University's Health Sciences Center advance permission to access "sexually explicit material in connection with or necessary to the duties of a faculty or staff member." *See* Pl.Ex. 12 (Cantrell Dep.), Dep. Ex. 4. Similarly, the Director of the University's Office of Information Technology ("OIT") granted employees in that department advance permission to access "sexually explicit materials if those acts are connected with or necessary to an OIT/ITC employee's official duties." Pl.Ex. 8 (McClure Dep.), Dep. Ex. 14. McClure testified that she felt compelled to grant a blanket approval "[b]ecause I wouldn't do anything but approve exceptions if they were on a case by case basis." Pl.Ex. 8 (McClure Dep.) at 61 11. 1–2. We find it significant that in these cases of blanket approval, the agencies have used a broader standard than the Act's in that they allow access where the materials are either work related or work required. This is strong evidence that for academic institutions, at least, the Act's limitation to "required" is too narrow. Taken as a whole, these examples suggest either that the Act as written is unworkable, is largely being ignored by state institutions as superfluous and burdensome, or that it may be deterring speech by state employees. Any such inference bodes ill for the Act's validity. Indeed, the blanket approvals indicate attempts to refocus decisions concerning access to sexually explicit material to whether material is work related—a standard not permitted under the Act.

The Court of Appeals for the District of Columbia considered a similar prior approval provision which allowed the government to approve otherwise restricted speech if it found such speech to be "within the mission of the agency." *See Sanjour,* 56 F.3d at 97. The court stated: "Far from being the saving grace of this regulatory scheme—as the government suggests—the broad discretion that the regulations vest in the agency reinforces our belief that they are impermissi-

---

7. These are Radford University, the University of Virginia, and the College of William and Mary. *See* Plaintiff's S.U.F. ¶ 145. Only at Radford University and the College of William and Mary were these requests made by professors. *See Id.* ¶ 155 (Radford English professor requested access in order to write book on censorship);

¶ 156–60 (William and Mary English professor requested access relating to 18th Century studies, Sociology professor requested access for studies of deviant behavior and social control, Machine Shop Supervisor requested access for study concerning personal medical problems).

ble." *Id.* The court concluded that the approval provision "justified an additional thumb on the employees' side of [the] scales" in any balancing against governmental interests. *Id.* We find the same to be true here, and conclude that the prior approval provision weighs heavily against the Commonwealth in the *Pickering/NTEU* balancing test.

### The Existence of Content–Neutral Alternatives

■ Finally, state employees are already subject to content-neutral policies and statutes that address the legitimate concerns which the Commonwealth is trying to address with the Act. For example, the Commonwealth's Policies and Procedures Manual prohibits state employees from making "unauthorized use" of state equipment, and was recently amended to prohibit the "[i]nappropriate or unauthorized" use of state computers and the Internet. *See* Commw. of Va. Dept. of Personnel and Training, *Policies and Procedures Manual* at 5 (Pl.Ex. 18); Memo from Charles E. James, Sr., Director of the Dept. of Personnel and Training, to Agency Heads and Human Resources Directors (Nov. 12, 1996) (Pl.Ex. 19). State agencies, colleges and universities have similar content-neutral standards in place designed to limit computer use to legitimate research purposes. *See* Plaintiffs' S.U.F. ¶ 136–37. Virginia Commonwealth University allows computer use "solely for the purposes of conducting university business." *See* Pl.Ex. 17, at 1. The University of Virginia prohibits computer use "unrelated to the University's mission," and Longwood College allows computer use "solely to support the mission of the College and its related academic, administrative and service activities." *See* Pl.Ex. 32 at 1; Pl.Ex. 31 at 1. Indeed, two of the incidents defendant complains of predate the Act and appear to have been resolved under the content-neutral policies existing at that time. As shown in defendant's exhibit 4, for example, an employee's conduct was reported to the Government Fraud, Waste and Abuse Hotline.

Likewise, content-neutral federal laws and regulations exist to deter the creation of a sexually hostile work environment. *See e.g.,* 42 U.S.C. § 2000e–2(a)(1); 29 C.F.R. § 1604.11(a); *see also Harris v. Forklift Sys.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). These authorities already provide civil penalties for acts of sexual harassment, and cut across media to include print displays of sexually hostile material. In addition, state obscenity laws provide criminal penalties for the most extreme workplace displays of sexual material. *See* Va.Code Ann. § 18.2–372 *et seq.* When reviewed against the provisions above, it is clear that the Act presents no improvement over existing federal law and state laws and policies concerning computer use and the Internet.

Given the over– and underinclusiveness of the Act and the existence of content-neutral alternatives, this Court concludes that the Act does not constitute a "reasonable response" to the Commonwealth's legitimate interests under the *Pickering/NTEU* standard. Although workplace efficiency and the avoidance of hostile work environment claims are undoubtedly important governmental interests, the Act fails to advance these interests in a direct and material way. Moreover, the Act restricts speech far beyond what is necessary to advance the interests it purports to address. Most troubling of all, the Act's poor fit and the availability of content-neutral alternatives suggest that the Act was intended to discourage discourse on sexual topics, "not because it hampers public functions but simply because [the state] disagree[s] with the content of employees' speech." *Rankin,* 483 U.S. at 384. The Supreme Court has made it clear that the government may not use its authority over public employees for such a purpose. *See id.* at 383–84. As such, we cannot find that the Commonwealth's justifications for the Act outweigh the interests of thousands of state employees and the public in expression on sexually explicit topics. *See NTEU,* 513 U.S. at 468. This Court therefore concludes that the Commonwealth has failed to satisfy the heavy burden required of it under the *Pickering/NTEU* balancing test.[8] Given this con-

---

8. As an alternative justification for the Act, the Commonwealth argues that the Act is needed to deal with the secondary effects associated with sexually explicit speech in the workplace. *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41,

clusion, the Court finds that the Act violates the First and Fourteenth Amendments of the United States Constitution and, therefore, must be invalidated. An appropriate order will be entered.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the plaintiffs' Motion for Summary Judgment is GRANTED and the defendant's Motion for Summary Judgment is DENIED, and it is hereby DECLARED that Va.Code §§ 2.1–804, *et seq.*, entitled "Restrictions on State Employees Access to Information Infrastructure" violates the First and Fourteenth Amendments of the United States Constitution and is, therefore, invalid.

Because they are the prevailing parties, plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988. Plaintiffs should submit their fee petition within eleven (11) days.

106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Under this doctrine, restrictions on sexual speech have sometimes been allowed where the law at issue was aimed not at content but at secondary effects associated with such speech, for example crime or eroding property values. *See id.* Here, the secondary effects claimed by the government are the offense, upset, and falling morale of employees involuntarily exposed to sexually explicit materials in the workplace. The Supreme Court has expressly placed such harms outside the scope of the secondary effects doctrine, stating that "[l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in Renton" and that "[t]he emotive impact of speech on its audience is not a 'secondary effect.'" *See R.A.V.,.* 505 U.S. at 394 (quoting *Boos v. Barry,* 485 U.S. 312, 321, 334, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)). Accordingly, we conclude that defendant's secondary effects argument does not merit serious consideration here.