LUTTIG, Circuit Judge,
concurring:
I join in Judge Wilkins’ fine opinion for the court. I agree that the , Commonwealth of Virginia may regulate its employees’ access to “bestiality, lewd exhibition of nudity, ... sexual excitement, sexual conduct or sadomasochistic abuse, ... coprophilia, urophilia, or fetishism,” on the public’s computers, in the public’s offices, on the public’s time, and at the public’s expense, without infringement on any First Amendment right of those employees. The Supreme Court’s precedents would not countenance the contrary conclusion reached by Judge Wilkinson and the dissent.
Judge Wilkinson reaches his conclusion, writing, as he understands it, in support of academic freedom. Because of its analytical flaws and the pyrrhic victory it offers the academy, however, I believe that the true academic will understand that Judge Wilkinson’s opinion ultimately will be of little service to the real cause of academic freedom, despite its superficial appeal. More importantly, however, as I explain below, the true academic is actually in no need of such attempts at support—least of all from the federal judiciary.
From time to time, even within the confines of an Article III case or controversy, jurists express their general and personal views on subjects related (and, to be honest, often unrelated) to the particular legal issues before them. It is best that we do so infrequently, and ideally we would never do so, because such naturally gives rise to the legitimate question whether, when we do write opinions only of law, our personal views have influenced or even supplanted the dispassionate, reasoned analysis that defines the Judiciary in our constitutional scheme. At points, what Judge Wilkinson writes in his opinion might fairly be understood as more in the nature of a general statement of personal viewpoint because he comments on a range of matters legal and non-legal, including: the aggregate social impact of “subjects touching our physical health, our mental well-being, our economic prosperity, and ultimately our appreciation for the world around us and the different heritages that have brought that world about,” post at 428; the asserted perniciousness of affirmative action and college speech codes to our cultural progress, post at 430-31; the need for intolerance of sexual harassment in every setting, post at 431-32; the “exponential growth of freedom” for society in general that comes with the “modern technological development” of the Internet, post at 431, 433-34; the importance of federalism in our system of governance, post at 433— and even the imperative for judicial restraint. Post at 433-34.
But he does also express the opinion on the issue that is before us, that there is a *417 First Amendment right of “academic freedom” and that other public employees do not possess an analogous First Amendment right to pursue matters that they believe are important to performance of their public responsibilities. Because he writes separately and does not join in either of the court’s principal opinions, Judge Wilkinson’s is an opinion of significance to our court. Accordingly, even though it be that of only a single judge, it is right that that analysis be subjected to the rigors of conventional legal analysis. When subjected to such analysis, I believe it is apparent that the conclusions he reaches and the means by which he reaches those conclusions are analytically indefensible.
First, it is unclear even in whom Judge Wilkinson would create his new constitutional right. For example, from reading his opinion, one cannot discern whether he is creating a right in professors generally, in only university professors, in all academics, in all institutions of learning, in only universities, in all public employees, in some of the above, or in all of the above. All that is clear is that he is emphatic that a new constitutional right must be created. If there were nothing else, one might suppose from the fact that he discusses the impact upon the academy purportedly only as “illustrative” of the Commonwealth’s statute on all public employees, see post at 427 (“I consider the statute’s application to academic inquiry as a useful illustration of how the statute restricts material of public concern.”) (emphasis added), that he would recognize for all public employees the same constitutional right that he apparently would create for academics. At the end of the day, however, his analysis and conclusion confirm that indeed he would not recognize the same right in all public employees, and that his new-found right is reserved for professors alone. He begins his opinion with that conclusion: “By thus preserving the structure of university self-governance, the statute withstands constitutional, scrutiny.” Post at 426. He ends his opinion with this same conclusion: “Because the limited restrictions in this Act are administered within the traditional structure of university governance, I do not believe the Virginia statute contravenes the Constitution.” Post at 434. And his entire discussion focuses on the need for such a special right for those in the- academic community. Indeed, nonacademic public employees are never mentioned by Judge Wilkinson, except in passing, and in ways that are substantively irrelevant. Judge Wilkinson simply, and quite genuinely, believes that the academy has a special contribution to make to society, beyond that that the ordinary citizen is able to make, and that its “speech” should enjoy constitutional protection that other public employees’ speech should not.
Second, at the same time that Judge Wilkinson fails to identify even in whom he would vest the constitutional right that he would create, he also never defines the First Amendment right that he so unreservedly would recognize. As a court, we have before us a discrete question of law as to whether the particular speech limited by the statute we interpret is subject to the protection of the First Amendment, and the majority addresses itself to that speech and only to that speech, as a court should. Judge Wilkinson is certain that “the First Amendment does not slumber while the state regulates” the speech in question here, post at 426, that “the legislative scythe [has] cut[ ] a broad swath through the field of public employee speech,” post at 426, that “some umbrella of protection” must be extended to public employee speech, lest they be “caught in the rain,” post at 428, and that no “stream or tributary” of the “broad river of American speech [should be] shut off,” post at 435., However, he never actually identifies the speech that he concludes is entitled to First Amendment protection.'
Thus, he begins his opinion as if the speech that he - concludes is protected is the speech of “Internet access.” Post at 426. One page later, he states that the *418 threshold inquiry in this case, rather, is whether “the use of the Internet for academic research” relates to a matter of public concern. Post at 426. Four pages after that, he suggests something entirely different — that the speech at issue, and the speech that is addressed by the statute, is “academic inquiry,” and even “academic curiosity.” Post at,428. Within the very same paragraph, he says not that it is academic curiosity, but, instead, “research in socially useful subjects such as medicine, biology, anatomy, psychology, anthropology, law, economics, art history, literature, and philosophy” that is the “matter of public concern.” Id. In the next paragraph after that, he says that it is the “content of academic fields” which is at issue. Post at 428. And later in that same paragraph, he implies that it is “Internet research” that is the relevant speech. Id.
' He vacillates between “use [of] the Internet to research - and write”- and “research and writing” generally as the speech of public interest in the very next paragraph. Post at 428. And he later suggests, in the same paragraph in which he states that it is “a professor’s research projects” that is the First Amendment protected speech, post at 429, that it actually is. the “professor’s work” that is the speech on a matter of public concern, post at 428. And he recites in the very next sentence that it is “the. content of [professorial] Internet research” that is at issue in this case, post at 429, only a page, later, to observe that it is “[s]peech in the social and physical sciences, the learned-professions, and the humanities” that is,in the public interest, and this because it is “central to our democratic discourse and social progress.” Post at 430. Two pages later still, he says it is “academic speech” that is the speech on a matter of public concern that he addresses. Post at 430-31. On that same page, he says that it is the “informational resource” of the Internet that is the relevant speech. Id. And, finally, Judge Wilkinson tells us that it is “academic freedom,” which he nowhere defines, that is.entitled to the protection of the First Amendment, a concept that one must. assume includes not only research and writing, but also teaching. Post at 432. .
The only speech that Judge Wilkinson does not explicitly identify as relevant, and for reasons obvious, is the only speech that actually is relevant for purposes of the case or -controversy before us. That “speech” is Internet access, on state computers and on state time, to websites that offer displays of “bestiality, lewd exhibition of nudity, ... sexual excitement, sexual conduct or sadomasochistic abuse, ... co-prophilia, urophilia, or fetishism.” Va. Code Ann. § 2.1-804. And the “academic research” in particular that is proffered to this court as deserving of First Amendment protection by the professor plaintiffs, and that must be, and is, accepted by Judge Wilkinson as an example of the highest “matter of public concern,” includes, as described by the district court, “graphic images of a nude woman in chains, a nude man with an erection, and a man and woman engaged in anal intercourse,” see Urofsky v. Allen, 995 F.Supp. 634, 639 (E.D.Va.1998). Or, as that research appears in the record before us, a close-up photograph of a woman holding open her buttocks, so that her dilated anus and genitals, pierced with multiple earrings, are visible, J.A. 182; a photograph of- a woman wearing a false penis and engaging in anal intercourse with another individual of unidentifiable sex, J.A. 183; a photograph of a naked- man apparently hanging by his wrists from a chain to which are attached numerous sexual paraphernalia, J.A. 170; a photograph of a naked woman, spread-eagle, whose wrists and ankles have been .chained and extended, J.A. 179; a photograph of a close-up of the erect genital of a man, J.A. 181; and a photograph of a naked woman whose wrists have been padlocked together behind her back, J.A. 178. Although he never addresses himself to this speech, which is the speech at issue in the case, Judge Wilkinson says that “[t]he content and con *419 text of the speech covered by this statute leave no doubt that the law in question affects speech on matters of public concern.” Post at 427. I agree that the fact that university professors, with no apparent pedagogical reason therefor, are accessing material like this at public taxpayers’ expense, on public taxpayer time, and with public taxpayer-purchased computers — all under the auspices of “academic research” — is a matter of public concern, but I believe that it is so for reasons quite different from Judge Wilkinson’s.
Third, even-if one takes Judge Wilkinson to hold that it is “academic freedom” or “academic research” that is entitled to “the ancient safeguards of the First Amendment,” post at 431, he does not even attempt to support the existence of such a right in either the text of the Constitution or Supreme Court precedents, or even through resort to the history or traditions of our Nation. He simply asserts that there is (and assumes that there must be) a First Amendment right in such speech, however it is defined. And this,- in the face of the substantial Supreme Court and other precedent marshaled by Judge Wilkins to the effect that there is no such right, and certainly no such individual professorial right. Ante at 411-15. As Professor Rabban, on whom Judge Wilkinson so heavily relies for a different point, has put it:
Fitting academic freedom within the rubric of the first amendment is in many respects an extremely difficult challenge. The term “academic freedom,” in obvious contrast to “freedom of the press,” is nowhere mentioned in the text of the first amendment. It is inconceivable that those who debated and ratified the first amendment thought about academic freedom.
David M. Rabban, Functional Analysis of “Individual” and “Institutional” Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 237 (1990). Thus, although Judge Wilkinson trumpets judicial restraint when explaining (as to an issue that is not before the court today) that courts must be reticent to review the decisions of deans and other university administrators on whether to grant research waivers under the statute at issue, post at 433 (“It is well-established that federal courts have no business acting as surrogate university deans.”), his fanfare can hardly be heard over the clashing from his own unabashed creation of new constitutional rights out of whole cloth — an unabashedness that forces his surrender of the high ground that he has assumed in the debate over judicial activism. See, e.g., Gibbs v. Babbitt, 214 F.3d 483, 491-92 (4th Cir.2000) (Wilkinson, J.) (“The irony of disregarding limits on ourselves in the course of enforcing limits upon others will assuredly not be lost on those who look to courts to respect restraints imposed by rules of law.”); Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 163 (4th Cir.2000) (en banc) (Wilkinson, J.) (“This case illustrates at heart the importance of judicial restraint.”); Johnson v. Collins Entertainment Co., Inc., 199 F.3d 710, 725-26 (4th Cir.1999) (Wilkinson, J.) (“Legal constraints cannot yield even to the noblest of intentions, for judicial visions of the social good will differ from issue to issue and from judge to judge, and will, if allowed to run unchecked, thwart the expression of the democratic will.”).
Fourth, when, in all but afterthought, Judge Wilkinson finally does turn to the determinative Pickering balance, he ignores the critical aspect of that analysis as set forth by the Supreme Court: the question whether the plaintiffs are speaking in their roles as citizens or in their roles as employees. In all three of its seminal cases on public employee speech, the Supreme Court has placed heavy emphasis on whether the speakers in question were acting in their roles as employees. In Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a case in which the Court extended protection to a teacher’s letter to a newspaper *420 concerning school budgeting, the court emphasized that “the fact of employment [was] only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher,” and that, for that reason, it was “necessary to regard the teacher as the member of the general public he [sought] to be.” Id. at 574, 88 S.Ct. 1731. In Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), which presented the question whether a prosecutor could be fired for circulating a. questionnaire in her workplace, the Court made the importance of the employee/citizen distinction clear in its very holding sentence: “We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision.... ” Id. at 147, 103 S.Ct. 1684. (emphasis added). Finally, and ironically, United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the authority relied on most extensively by Judge Wilkinson, provides perhaps the most powerful indictment of Judge Wilkinson’s failure to address the employee/citizen distinction. There, in striking down a law banning federal government employees from collecting hono-raria for speaking or writing, the Court emphasized that:
[The plaintiff-government employees] seek compensation for their expressive activities in their■ capacity as citizens, not as Government employees. ■ They claim that their employment status has no more bearing on the quality or market value of their literary output than it did on that of Hawthorne or Melville. With few exceptions, the content of the [government employees’] messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work. They do not address audiences composed of co-workers or supervisors; instead, they write or speak for segments of the general public. Neither the character of the authors, the subject matter of their expression, the effect of the content of their expression on their official duties, nor the kind of audiences they address has any relevance to their employment.
Id. at 465, 115 S.Ct. 1003. (emphasis added). Thus, although the public concern/personal interest distinction is no doubt of importance under Connick, the citizen/employee distinction is, by force of these three authorities, equally so, at the very least.
Judge Wilkinson never quotes or otherwise references any of these key passages from Pickering, Connick, and NTEU. Indeed, in the only passage in which Judge Wilkinson makes any reference to the fundamental distinction between the 'individual acting in his role as employee and the individual acting in his role as citizen, he criticizes our court and the Commonwealth for our over-emphasis on it. See post at 426-27 (“[T]he majority ... goes astray by placing exclusive emphasis on the fact that the statute covers speech of ‘state employees in their capacity as employees.’ ”); compare id. with Boring v. Buncombe County Bd. of Education, 136 F.3d 364, 375, 379 (Motz, J., dissenting) (“Conceivably, the majority’s holding is grounded in misreading Connick to make the role in which a public employee speaks determinative of whether her speech merits First Amendment protection.”). And, in effect to read the employee/citizen distinction out of Pickering and its successors'altogether, Judge Wilkinson eventually completely mierges the employee/citizen analysis into the public concern/private analysis, criticizing the Commonwealth for “begin[ning] and end[ing] the public' concern inquiry with the signature on the plaintiffs’ paychecks or the serial number on their computers.” Post at 429. Thus, by the time he is through, although seemingly without even realizing that he has done so, Judge Wilkinson has purged altogether from *421 Connick and Pickering the public employee/private citizen analysis that he himself has consistently held is critical. See, e.g., Robinson v. Balog, 160 F.3d 183, 189 (4th Cir.1998) (Wilkinson, J.) (“By Responding to the Board’s invitation to testify at a public hearing and by cooperating with law enforcement investigators, Robinson and Marc spoke not in their ‘capacity as ... public employee[s],’ DiMeglio, 45 F.3d at 805, but as ‘citizen[s] upon matters of public concern.’ Connick, 461 U.S. at 147, 103 S.Ct. 1684, 75 L.Ed.2d 708.”).
It is unsurprising that Judge Wilkinson would avoid the question whether the plaintiffs here are speaking in their roles as public employees or in their roles as private citizens, because in the answer to that question lies the refutation of the constitutional right that Judge Wilkinson concludes exists. For, when university professors conduct university research on university time, on university computers, and in conduct of their university duties, it is indisputable that they are performing in their role as public employees of the university, even though Judge Wilkinson is unwilling to accept as much. See post at 428 (“[I]n their research and writing university professors are not state mouthpieces — they speak mainly for themselves.”). They are as different as can be imagined from the teacher who wrote to the newspaper in Pickering, the prosecutor who circulated the questionnaire in Connick, or the federal government employees who gave speeches and wrote articles for the general public in NTEU. The professors’ research is conducted on computers and via Internet access services that are both paid for by the public; thus, the professors’ research is itself paid for by the people of the Commonwealth of Virginia. Indeed, the professors are paid to conduct the research that they do. The professors’ research thus belongs to the public (at least in the only sense that matters here). In a word, when conducting their research so that they may better discharge their professorial responsibilities to the public, these professors are speaking qua public employees, not qua private citizens. I cannot imagine that anyone would contend otherwise. Certainly, the professors before us are not so brazen as to do so.
Fifth, -with respect to those portions of the Pickering analysis to which Judge Wilkinson does address himself, not only does he identify incorrectly the employee speech to be balanced, he incorrectly identifies the corresponding state interest that would be balanced were he correct that that employee speech was the relevant speech under Pickering.
Thus, consistent with his exclusive focus on academic speech in the first half of his opinion in which he identifies the employee speech at issue — which focus he said at that point was “illustrative” only, see post at 427' — he identifies as the entirety of the relevant employee speech for purposes of his Pickering balance the academic speech discussed in the first half of his opinion. (At this point in his opinion, Judge Wilkinson is unwilling to assert that this speech relates to a matter of public concern; rather, he says only that it “potentially touches on” such matters. Post at 432.). If one chooses to balance only the academic employees’ interests, as does Judge Wilkinson, then one must balance against that interest only the governmental interest in regulation of that academic speech, not the government’s interest in regulation of that same kind of speech by all of the state’s public employees, as does Judge Wilkinson. And the only principled conclusion that one can reach upon thus properly balancing the correct interests is that the Commonwealth’s statute cannot stand — a consequence that Judge Wilkinson (even at the cost of analytical incredibility) is unwilling to accept. For, if the academic employees’ First Amendment interests are as profound as Judge Wilkinson believes them to be, then the government’s interest in regulating the university professors’ private access to the prohibited materials *422 for individual research purposes pales by comparison.
That is, it is unquestionable not only that academic research in general is of utmost importance, but also that there could well be legitimate research that would entail, if not necessitate, access to the very kinds of material to which access is prohibited by the Commonwealth’s statute. And it is also unquestionable that an individual professor’s private access to such materials in the sanctity of his own office would have little, if any, disruptive effect on the workplace at all. Indeed, I cannot imagine a governmental interest either specific to university professors or equally applicable to them as to any other public employee that would override those academic freedom interests. And, obviously, neither can Judge Wilkinson, despite his affirmance of the Commonwealth’s statute on the very ground that the state’s interest in the avoidance of workplace disruption surpasses the professors’ First Amendment right to research the matters proscribed by the statute. Not only does he identify none at all; he does not even attempt to do so. In fact, the state’s interest in avoidance of workplace disruption, that Judge Wilkinson balances against the professors’ interest in “academic freedom,” is wholly unattributable to the professor plaintiffs. See post at 431 (“The posting of such material on web sites in state offices 'has led to workplace disruption and complaints that such sexually graphic matter contributes to a hostile work environment.”).
In other words, if one really believed that there is an actual constitutional right to academic freedom and that it is a right of the importance believed by Judge Wilkinson, then he would unhesitatingly invalidate the Commonwealth’s statute as urged by the professor plaintiffs (at least as applied to them) — not sustain it and dismiss the' plaintiffs’ research as “abuse” and “misconduct,” as does Judge Wilkinson, post at 481-32 — because the state’s interest in limiting individual professor access to the proscribed material within the privacy of the professor’s own office is, and obviously so, comparatively insignificant to the professor’s interest in academic freedom. It is for this reason that Judge Wilkinson’s seemingly bold recognition of a constitutional right in the university professors is but a pyrrhic victory (indeed, as it is indirectly for all public employees), because it is a right that must yield to the subjective and uninformed views of the federal judiciary, and even beyond that, to the most negligible of governmental interests. .
Of course, it is not academic speech alone that must be balanced under Pickering, contrary to Judge Wilkinson’s belief. It is the speech of all public employees who would engage in “research” that must be balanced against the state’s interest in the regulation of this particular speech by all of its employees. The consequence of this proper balancing, however, is that one is unable to recognize a special First Amendment right in academics over all other public employees — a consequence that Judge Wilkinson likewise is unwilling (also at the cost of analytical incredibility) to accept.
Sixth, and most tellingly, in his understandable haste to express disapproval of the material to which access has been denied by the Commonwealth, Judge Wilkinson' actually does not perform any balancing at all — none at all. The total of his reasoning on the Pickering balance is that the Commonwealth’s revised statute “restricts a more limited range of material” than its predecessor statute, post at 432— which of course is to say nothing as to the relative weight of the respective employee and governmental interests. Given the complete absence of any attempt at the Supreme Court — required balancing of interests under Pickering, the only reasonable conclusion that can be drawn is that, at least by this point in his opinion, Judge Wilkinson knows well that the result of that balancing would be precisely opposite that which he wishes to reach. That balancing would yield either the validation of *423 the Commonwealth’s statute as to all employees of the State, not just the State’s academic employees, or the invalidation of the statute as to all of the State’s employees, academic and non-academic alike.
Judge Wilkinson believes that he has undertaken the substantive equivalent of the required balancing of interests in reaching his conclusion that the state’s interests outweigh those of the relevant public employees, because he goes on to consider that the statutory waiver power resides in the university itself and thus that the intrusion on the public employees’ speech interests is “minimal.” Post at 432. Of course, in neither substance nor form is this the equivalent of the Pickering balance.
However, even if one views the waiver provision as a free-floating savings provision somehow related to the required Pickering balance, as Judge Wilkinson mistakenly does, then that provision should not have the constitutional effect that Judge Wilkinson concludes it has. If one believes, as does he, that the constitutional right of “academic freedom” belongs to the individual university professor, then the fact that the state government, acting through the university’s administration, holds the power of censorship cannot possibly be viewed as a feature that saves the statute from unconstitutionality. It may be that, if put to the choice, every professor would rather have the power of censorship rest with their academic colleagues than with the state’s elected officials. However, no professor would believe that his right of academic freedom is safeguarded merely because it can be denied only by his politieally-accountable university administrators, as this litigation-brought by professors notwithstanding the state’s conferral of the ivaiver authority upon the university — proves. In fact, as one of the professors on whom Judge Wilkinson relies extensively explained in the article on which Judge Wilkinson relies, the seminal academic definition of “academic freedom” was itself derived in response to “threats to professors from university trustees.” David M. Rabban, Functional Analysis of “Individual” and “Institutional” Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 229 (1990) (“Threats to professors from university trustees loomed behind the seminal professional definition [of academic freedom] produced in 1915 by a committee of eminent professors for the first annual meeting of the American Association of University Professors (‘AAUP’).”).
But, even more fundamentally, the university does not exercise the waiver authority with respect to the vast number of public employees as to whom the Commonwealth’s statute also applies, a fact that is ignored by Judge Wilkinson. Compare post at 432 (observing that “[u]nder the Act, the ultimate judgment on whether a requested waiver is for a bona fide research project resides in the system of university governance”) with id. (noting in next sentence that “[t]he statute grants ‘agency heads’ the authority to approve these waivers”). The waiver provision may, in Judge Wilkinson’s view, save the Commonwealth’s statute from constitutional infirmity when the statute is applied against the university professor, because it represents the repository of the critical authority of self-governance in the institution itself, rather than in the state. See id. But one may be assured that Judge Wilkinson would not so view the waiver provision when the statute is applied instead against the ordinary public servant, who is “left in the rain” by Judge Wilkinson. For the ordinary public servant, to confer the waiver authority in the relevant state department head would be, in Judge Wilkinson’s words, to consign that employee’s speech to “a First Amendment netherworld.” See post at 431.
Finally, Judge Wilkinson’s opinion in concurrence today is, it should come as no surprise, irreconcilable with our own Circuit’s precedent in Boring v. Buncombe *424 County Bd. of Education, 136 F.3d 364 (4th Cir.1998), an opinion in which he joined at the time. In Boring, we held unequivocally, against a First Amendment challenge indistinguishable from that here, that a high school teacher does not have a First Amendment right in the secondary school’s curriculum itself. Judge Wilkinson, understanding the incompatibility of his position in Boring with the position he takes today, distinguishes Boring on the ground that, unlike curriculum choices, a professor’s research and writing does not bear the imprimatur of government. See post at 428-29. Boring, of course, did not rest upon any such notion of official imprimatur. It rested, instead, as we said, solely on the firm belief that the teacher possessed no First Amendment right in the curriculum itself; that this was the rationale for our decision is as clear from Judge Motz’s dissent as it is from the text of the majority opinion. To attempt to distinguish Boring on the ground of official imprimatur is to betray at once not only disagreement with the essential holding of that case, but fundamental agreement with the dissent in that case. Compare post at 427 (Judge Wilkinson asserting that the “ ‘content of the speech [here] surely touches on matters of political and social importance’ ” with Boring, 136 F.3d at 375, 378 (Motz, J., dissenting) (“Although Boring’s in-class speech does not itself constitute pure public debate, obviously it does ‘relate to’ matters of overwhelming public concern .... ”)); see also id. at 379. If research and writing is “a matter of public concern” within the intendment of Connick and Pickering, as Judge Wilkinson believes it is, then surely far more “a matter of public concern” is the curriculum of our elementary and secondary schools, and consequently far clearer is the elementary and secondary school teachers’ First Amendment right to participate in, if not direct entirely, the curriculum of our young.[1]
The factual assertion on the basis of which Judge Wilkinson would distinguish Boring is itself revealing of the doctrinal conundrum in which he finds himself vis-a-vis Boring. For his needed distinction of Boring, Judge Wilkinson asserts that, when professors research and write, “they speak mainly for themselves,” post at 428, a declaration in support of which he can cite but a lone academic article from Law & Contemporary Problems, see id. (citing David M. Rabban, Functional Analysis of “Individual” and “Institutional” Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 242-244 (1990)). If it is the case that the public university’s professors operate independently of state supervision and public accountability, then it is a surprise to me. And I am confident that it would come as a surprise to the public, who pays the professors’ salaries in order that they may conduct important research for the public and without whose tax money the professors’ research and writing would not be possible.
I do not chronicle these analytic flaws in Judge Wilkinson’s analysis for the sake of chronicling. Collectively, each building upon the other, these errors disguise, I believe even from Judge Wilkinson, the uncomfortably counter-precedential and counter-intuitive conclusions that he can, as a result, reach seemingly quite comfortably. If one does not identify in whom a particular right would be created, then he need never confront the consequences of the principled extension of the same right to the similarly situated. If one does not *425 identify the actual right that is created, then he is never obliged to reconcile the creation of that right with the precedent extant. If one ignores the critical step of the established analysis, then he has preordained his conclusion. If one places a thumb on the scale of the determinative balance, then the resulting measure will be the foreseeable consequence of that weighted balance. And if one conducts no balancing at all, then the measure will be that which he, and he alone, tells us it is.
The true academic should find small comfort in such a defense of his academic freedom.
In reality, however, the true academic is in no need of defense. The court holds today, as has been uniformly recognized by the Supreme Court through the years, only that there is no constitutional right of free inquiry unique to professors or to any other public employee, that the First Amendment protects the rights of all public employees equally. Neither the value nor the contributions of academic inquiry to society are denigrated by such a holding. And to believe otherwise is to subscribe to the fashionable belief that all that is treasured must be in the Constitution and that if it is not in the Constitution then it is not treasured. But precisely because it is a constitution that we interpret, not all that we treasure is in the Constitution. Academic freedom is paradigmatic of this truism. Academic freedom, however, is also paradigmatic of the truism that not all that we treasure is in need of constitution-alization. No university worthy of the name would ever attempt to suppress true academic freedom — constrained or unconstrained by a constitution. And, if it did, not only would it find itself without its faculty; it would find itself without the public support necessary for its very existence. The Supreme Court has recognized as much — be it through wisdom, prescience, or simple duty to the Constitution— for over two hundred years now. It has recognized that, in the end, the academic can be no less accountable to the people than any other public servant. His speech is subject to the limitations of the First Amendment certainly no more, but just as certainly no less, than is the custodian’s. That we should all be accountable to the people, and accountable equally, should cause none of us to bridle.

. Elsewhere in his concurrence, when the need is different, Judge Wilkinson presents Boring as a decision chiefly premised not on official imprimatur, but, rather, on the necessity of institutional governance. Post at 432-33; see discussion supra. Boring was no more about institutional governance than it was about official imprimatur. There is not even a hint in our opinion in Boring that we would have viewed a state statute forbidding the teaching of lesbianism any differently than we viewed the high school’s forbiddance— nor, given our reasoning, would one ever expect to find such a suggestion in the opinion.